# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 693 CAP |
| | : |
| Appellant | : Appeal from the Order entered on |
| | : 01/10/2014 in the Court of Common Pleas, |
| | : Criminal Division of Philadelphia County at |
| v. | : No. CP-51-CR-0632821-1991 |
| | : |
| | : SUBMITTED:   October 27, 2014 |
| EDWARD BRACEY, | : |
| | : |
| Appellee | : |

## OPINION

**MR. JUSTICE EAKIN**                                    **DECIDED:   June 16, 2015**

The Commonwealth appeals from the order of the Philadelphia Court of Common Pleas granting appellee's Post Conviction Relief Act (PCRA)[1] petition; the PCRA court determined appellee suffered from intellectual disability[2] as defined in Commonwealth v. Miller, 888 A.2d 624 (Pa. 2005), and vacated his death sentence pursuant to Atkins v. Virginia, 536 U.S. 304 (2002), which held the Eighth Amendment of the United States

---

[1] 42 Pa.C.S. §§ 9541-9545.

[2] Herein, we use "intellectual disability" to refer to the condition previously characterized as "mental retardation," as the latter has largely been replaced in favor of the former. See, e.g., Hall v. Florida, 134 S. Ct. 1986, 1990 (2014) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013) (DSM-5)); American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Support 3 (11th ed. 2010) (AAIDD Manual).

Constitution prohibits the execution of individuals with intellectual disability. Id., at 321. We affirm that decision.

On February 4, 1991, Officer Daniel Boyle attempted to stop a stolen vehicle driven by appellee. When the car crashed, appellee got out, jumped onto the police car roof, and displayed a gun; when he came down from the roof, he aimed the gun at Officer Boyle, fired several shots toward the vehicle, and fled. Officer Boyle was shot and ultimately died. Two days later, appellee entered a home via the skylight and set himself on fire, leading to his arrest. He thereafter confessed to killing Officer Boyle.

On March 3, 1992, a jury convicted appellee of first degree murder, possessing an instrument of crime, criminal trespass, and theft by receiving stolen property. After a penalty-phase hearing, the jury found two aggravating circumstances: the killing of an officer in the line of duty, see 42 Pa.C.S. § 9711(d)(1), and appellee's significant history of felony convictions involving the use or threat of violence, id., § 9711(d)(9). No mitigating circumstances were found, and the jury set the penalty at death; the trial court sentenced appellee to consecutive imprisonment for the remaining convictions. This Court affirmed July 21, 1995. Commonwealth v. Bracey (Bracey I), 662 A.2d 1062, 1076 (Pa. 1995). Appellee filed a petition for writ of certiorari, which the United States Supreme Court denied April 1, 1996. Bracey v. Pennsylvania, 517 U.S. 1122 (1996).

In May, 1996, appellee filed his first pro se PCRA petition, which was later amended by his PCRA counsel. Appellee argued his trial counsel was ineffective for failing to present evidence of brain damage and mental illness during the penalty phase. The PCRA court denied appellee's petition July 28, 1998, concluding trial counsel's course of action was a strategic decision that did not prejudice appellee. See PCRA Court Opinion, 7/28/98, at 24-25. On December 31, 2001, we affirmed. Commonwealth v. Bracey (Bracey II), 795 A.2d 935, 938 (Pa. 2001).

Appellee filed his second PCRA petition August 15, 2002, claiming he was intellectually disabled and thus ineligible for the death penalty pursuant to the then-recent Atkins decision. Days before the evidentiary hearing, appellee's attorneys requested the hearing be cancelled, as appellee decided not to present any testimony. Counsel also argued a jury, not the court, was the appropriate fact finder to determine intellectual disability. Because appellee believed presenting evidence of intellectual disability would belie the latter argument, he chose not to do so and relied on evidence concerning brain damage and mental illness already in the record from his first petition.

The PCRA court ordered both parties to appear at the hearing, where appellee declined to present evidence and reasserted his jury claim. Finding the brain-damage and mental-illness evidence did not directly address intellectual disability, the PCRA court held appellee's petition was meritless and thus found the jury issue moot. See PCRA Court Opinion, 8/17/07, at 13-14. On appeal, we held "there is no federal constitutional right to a jury trial for Atkins claims presented in collateral proceedings." Commonwealth v. Bracey (Bracey III), 986 A.2d 128, 130 (Pa. 2009). However, given the PCRA court's ambiguous stance on whether appellee waived his jury claim, we vacated the denial and remanded for the court to conduct an evidentiary hearing on intellectual disability, see id., at 139-40, colloquially referred to as an Atkins hearing.

Upon the conclusion of the Atkins hearing, the PCRA court[3] determined appellee proved, by a preponderance of the evidence, he suffered from intellectual disability and therefore vacated his death sentence. The Commonwealth now appeals, arguing appellee's "internally irreconcilable evidence fail[s] … to support the PCRA court's

---

[3] Judge Jones presided over the case since 1996, but was appointed to the federal bench; the case was reassigned to Judge Sarmina in 2010. See PCRA Court Opinion, 4/7/14, at 3.

[intellectual disability] finding[,]" and requesting we alter Miller's standard to prevent "fraud and manipulation" upon our courts.   Commonwealth's Brief, at 2.

In an Atkins determination, our standard of review involves a mixed question of law and fact:

> A question involving whether a petitioner fits the definition of [intellectual disability] is fact intensive as it will primarily be based upon the testimony of experts and involve multiple credibility determinations.   Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous.   We choose this highly deferential standard because the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.

Commonwealth v. Hackett, 99 A.3d 11, 26 (Pa. 2014) (quoting Commonwealth v. Williams, 61 A.3d 979, 981 (Pa. 2013)) (internal quotation marks omitted).

Although Atkins held the Eighth Amendment prohibits the execution of persons with intellectual disability, Atkins, at 321, it largely left defining intellectual disability to the states, see id., at 317; Hall, at 1998 ("But Atkins did not give the States unfettered discretion[.]").   Faced with inaction from our General Assembly, this Court in Miller established a three-pronged standard for determining intellectual disability.   Mindful of the hazards of comingling legal and medical concepts, we held an individual seeking Atkins relief must prove, by a preponderance of the evidence, he is intellectually disabled as defined by either (a) the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) or (b) the American Association of Mental Retardation (AAMR), now named the American Association on Intellectual and Developmental Difficulties (AAIDD).   Miller, at 631.   Per the DSM-IV, intellectual disability[4] is defined as "significantly subaverage intellectual functioning (an

---

[4] The DSM-IV and AAMR Manual use the term "mental retardation[,]" while the DSM-5 and AAIDD Manual use "intellectual disability."   As there is no substantive change to the (continued…)

IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) at 39 (4th ed. text rev. 2000).[5] Similarly, the AAIDD defines intellectual disability as "significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." AAIDD Manual, at 5. Thus, the three components of intellectual disability proof are: (1) significantly subaverage intellectual functioning, (2) significant adaptive deficits, and (3) age of onset.

As to intellectual functioning, both the DSM-IV and AAIDD Manual define significantly subaverage intellectual functioning as approximately 30 points below a mean of 100. See DSM-IV-TR, at 39; AAIDD Manual at 31. Thus, accounting for two standard errors of measurement (SEM),[6] which is estimated to be approximately plus or minus five points for reputable IQ tests, see id. (citations omitted), we held an IQ score between 70 and 75 or lower satisfies the first prong. See Miller, at 631. Moreover, the relationship between the first and second prongs is fluid; if an IQ score is within the SEM

_____

(…continued)
definition of intellectual disability between the AAIDD and AAMR Manuals, see AAIDD Manual, at 6, we approve of the AAIDD Manual's definition. However, because the DSM-5 had not been published at the time of appellee's Atkins hearing, and it altered the DSM-IV's definition of adaptive functioning, compare DSM-IV, at 40, with DSM-5, at 37, we will evaluate the PCRA court's conclusion under the definition in the DSM-IV.

[5] Published in 2000, the DSM-IV-TR is the text revision of the DSM-IV.

[6] SEM is "'a unit of measurement: 1 SEM equates to a confidence of 68% that the measured score falls within a given score range, while 2 SEM provides a 95% confidence level[.]'" Hall, at 1995 (citation omitted). The "given range" for 1 SEM is thus 5 points, within 2 ½ above or below the articulated IQ score; the range for 2 SEM is 10 points, within 5 above or below the IQ score. The larger range logically engenders more confidence that it encompasses the relevant IQ.

range, i.e., 71-75, the examination of adaptive deficits becomes critical. See DSM-IV-TR, at 41-42 ("It is possible to diagnose [intellectual disability] in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior."); AAIDD Manual, at 36, 41; see also Williams, at 983 ("[A]n individual with an IQ score between 71 and 75 must have major deficiencies in adaptive behavior, whereas an individual with an IQ score lower than 70 must also be significantly deficient in adaptive behavior to be found [intellectually disabled]." (citation omitted)).

Adaptive behavior is the "collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives." AAIDD Manual, at 15; see also DSM-IV-TR, at 42. Under the DSM-IV, significant impairments in adaptive functioning are present if a person has significant limitations in at least two of the following skill areas: communication, functional academics, social/interpersonal skills, self-direction, home living, work, leisure, use of community resources, self-care, safety, and health. DSM-IV-TR, at 41. The AAIDD Manual analyzes adaptive behavior under conceptual, social, and practical domains, which largely overlap the DSM-IV areas. See AAIDD Manual, at 15, 44. However, the AAIDD Manual would measure adaptive behavior via a standardized assessment that quantifies adaptive deficits, defining significant limitations as at least two SEM below the mean of either one domain individually or an overall score of all three domains. Id., at 43.

The PCRA court held a four-day Atkins hearing in April, 2013. Appellee called two expert witnesses — Dr. Daniel Martell and Dr. Barry Crown — and three lay witnesses — Janet Whack, appellee's sister; Letitia Fletcher, a close friend of appellee's family; and Alan Grolnic, appellee's fifth-grade teacher. The Commonwealth presented the expert testimony of Dr. Paul Spangler.

Dr. Martell, a board-certified forensic psychologist, opined to a reasonable degree of medical certainty that appellee suffered from intellectual disability. See N.T. Hearing, 4/17/13, at 75. Addressing the first prong, he concluded appellee's intellectual functioning was significantly subaverage, consisting of an IQ score of 74 when averaging full-scale scores of 74, 78, 75, and 69, or a range of 64 to 74 when applying the SEM to the 69 score individually. Id., at 48, 203. Dr. Martell noted appellee has undergone IQ testing six times, scoring a 74 in 1976, a 78 in 1977, a 75 in 1992, a 75 in 1996, an 81 in 1997, and a 69 in 2011. In particular, he observed the 1976 test type was unknown since the score's only reference appeared in a Psychological Summary by Dr. Carol Andrews, who administered the 1977 test, a Wechsler Intelligence Scale for Children - Revised (WISC-R). In her summary, she noted appellee's score was a four-point improvement over a test administered 11 months earlier. Id., at 40-41; Psychological Summary, 2/24/77. Given the increase over a short time-span and commonality of school-administered IQ tests, Dr. Martell surmised it was highly probable the 1976 test was also a WISC-R. See N.T. Hearing, 4/17/13, at 40-41, 69. He further averred the increase was likely the result of "practice effects," improvement where one takes the same test twice within a year. See id., at 38, 41. The 1996 test, a Wechsler Adult Intelligence Scale - Revised (WAIS-R), was administered by Dr. Harry Krop, id., at 43, while the 2011 test, a Wechsler Adult Intelligence Scale - IV (WAIS-IV) was administered by Dr. Crown. Dr. Martell revealed he applied the SEM to the 2011 test score individually since the WAIS-IV is the "most psychometrically sophisticated" test available. Id., at 60. Because the 2011 test was the only post-Atkins exam and appellee had an incentive to put forth minimal effort, Dr. Martell also addressed concerns about the score's legitimacy, specifically referencing a subtest used to measure effort level. N.T. Hearing, 4/17/13, at 83. Remarking that "fakers" generally score a four or lower, Dr.

Martell indicated appellee scored a six, a sign of ample effort. Id., at 84. Similarly, he scored a five when the subtest was administered on the 1996 test. Id.

Notably, Dr. Martell omitted the 1992 and 1997 test scores from his calculation because the scores were calculated by proration, a practice he deemed unreliable and inappropriate for diagnostic purposes under both the DSM-IV and AAIDD Manual. Id., at 49, 62. Specifically, the scores each arose from three WAIS-R verbal subtests, which were then prorated into the 75 and 81 scores. Id., at 61-62. The 1992 test, conducted by the Department of Corrections (DOC), consisted of digit span, vocabulary, and similarities subtests, WAIS-R Record Form, 4/9/92; the 1997 test, administered by Dr. Carol Armstrong, contained information, similarities, and comprehension subtests. N.T. Hearing, 4/17/13, at 61. Unlike full-scale scores, which result from the administration of several subtests covering multiple components or factors, Dr. Martell characterized the scores as simply "prorated [v]erbal IQ" scores. Id., at 62.

On cross-examination, Dr. Martell admitted he was making an informed assumption the 1976 test was a full-scale WISC-R and it was possible the score could have been prorated. Id., at 186-88. The Commonwealth further underscored a statement within Dr. Andrews' 1977 summary that she thought appellee's true potential was even higher. See id., at 189. While disclosing he did not include the statement in his report, Dr. Martell disagreed the statement related to appellee's effort. See id. Moreover, he acknowledged the location of the 1977 test, a juvenile detention center, was not ideal, conceded the "practice effect" would be irrelevant if the 1976 and 1977 tests were not both WISC-Rs, and agreed the score, a 78, fell outside the range of intellectual disability. See id., at 190-94, 199. Similarly, Dr. Martell admitted he failed to reference the 1992 test in his report, id., at 216, and indicated the 1996 test was administered in prison, id., at 204. As for the 1997 test, Dr. Martell revealed he did not

verify Dr. Spangler's calculations, which produced a prorated score of 81, id., at 223, 226, but reiterated his issue was with prorating scores for Atkins cases in general, see id., at 240. Although agreeing a Wechsler exam type, the Wechsler Abbreviated Scales of Intelligence (WASI), allows for proration, he stated four subtests are required and would not prorate scores for such a "high-stakes situation." Id. The Commonwealth further suggested appellee's depression and Attention Deficit Disorder (ADD) negatively affected the 2011 test score, alluding to references within the 1977 and 1997 test notes, as well as testimony at the 1998 PCRA hearing. Id., at 253-59. The Commonwealth also underscored specific questions appellee answered correctly on pre-Atkins tests but incorrectly on the 2011 test. See id., at 265, 268-70. Dr. Martell did not think such an observation revealed a lack of effort, characterizing the Commonwealth's use of a few questions as "cherry picking." Id., at 270. Instead, he again referenced appellee's digit-span score and noted there were subtle differences between the phrasing of questions within the exams. Id., at 270-71.

As for the second prong, adaptive deficits, Dr. Martell determined appellee was significantly limited in eight areas under the DSM-IV, id., at 97, 100, and all three AAIDD domains, id., at 99. In order of severity, he stated appellee was significantly limited in: (1) functional academics, (2) communication, (3) self-direction, (4) social/interpersonal skills, (5) self-care, (6) home-living, (7) work, and (8) leisure. Id., at 101-02. In his assessment, Dr. Martell reviewed appellee's school, medical, and prison records, and interviewed appellee, his family members, one of his teachers, and Reverend Bruce Garver, a former principal of New Life Boys' Ranch, a reform school appellee attended from 1977 to 1978. See Report of Dr. Daniel A. Martell, 1/30/13, at 5. Further, he explained he looked for "convergent validity[,]" i.e., "different people from different walks of life … all describing the same phenomenon." N.T. Hearing, 4/17/13, at 120-21.

Referencing a writing sample Dr. Armstrong administered for the 1997 test, Dr. Martell highlighted spelling errors such as "purson" instead of "person[,]" id., at 104, and quoted her statement that appellee wrote "worse than a third grader[,]" id., at 103. Citing a mental evaluation, part of a 1982 pre-sentence report, Dr. Martell noted the examining doctor described appellee as "barely literate[.]" Id., at 105. He labeled appellee's GED score of 193 to be "[a]bout as bad as a person could do[,]" N.T. Hearing, 4/18/13, at 92, and noted all the individuals he interviewed substantiated appellee's academic shortcomings. See N.T. Hearing, 4/17/13, at 107-15. On cross-examination, the Commonwealth focused on appellee's strength in word recognition, observing Dr. Martell failed to include appellee's performance on the Wide Range Achievement Test (WRAT) in his report; appellee tested at eighth- and tenth-grade levels in 1992 and 1997, respectively. N.T. Hearing, 4/18/13, at 70-72. Dr. Martell agreed appellee had strength in word recognition, but stressed the WRAT assesses pronunciation, not comprehension, and even individuals with intellectual disability have strengths. See id., at 75-76. The Commonwealth also cited appellee's frequent instances of misconduct and absenteeism as causes of his academic shortcomings, id., at 36-65; however, Dr. Martell opined appellee's behavior was likely a "smokescreen" for his academic deficiencies, referencing interviews with the teacher and Reverend Garver, id., at 82-84; see also N.T. Hearing, 4/17/13, at 111.

Second, Dr. Martell addressed communication, remarking that appellee suffered from deficits in "both receptive and expressive language function[ing]." N.T. Hearing, 4/17/13, at 116. Studying statements by appellee's sisters and ex-girlfriend, he stated appellee's speech lacked meaningful content and recalled appellee would use the phrase "like this and like that" as a crutch. Id., at 116-17, 123-25. Further, he listened to prison recordings between appellee and his mother, observing appellee failed to

reciprocate or understand the basis of conversations, often simply replying "uh-huh." Id., at 94-95. Third, Dr. Martell defined self-direction as "the ability to carry through with projects or assignments independently without supervision[,]" id., at 130, noting appellee could not go to the store without forgetting what to buy or to get change, id. Eventually, appellee's family sent him with a list and a store employee would gather the items and place the change in an envelope. Id., at 130-31. Moreover, appellee would often get lost in his own neighborhood and have to call his mother for directions. Id., at 131.

Fourth, regarding social/interpersonal skills — i.e., one's "ability to form friendships, to bond with other[s], [and] function in a normal way," id., at 134 — Dr. Martell quoted statements from the 1982 mental evaluation that appellee showed evidence of a schizoid personality, which Dr. Martell explained as a "fancy label for a loner[.]" Id., at 136. Also, he suggested appellee's temperament was the result of negative childhood experiences, mentioning his nickname was "EZ" because he was easy to manipulate and describing how his ex-girlfriend tricked him into thinking she was pregnant for over a year. Id., at 136-37, 143. Fifth, discussing self-care, Dr. Martell testified appellee "wet himself[,]" put his shoes on the wrong foot until he was seven years old, and failed to engage in self-hygiene as a child. Id., at 152-55. Sixth, Dr. Martell branded leisure as "part of being a human being[,]" referencing appellee's inability to play basketball, checkers, hide-and-seek, and Monopoly; notably, appellee's siblings quit playing hide-and-seek with appellee because he would repeatedly hide under a blanket in the corner of the basement. Id., at 156-58. Seventh, as to home living, Dr. Martell stated appellee could not complete basic chores, such as laundry and taking out the trash. Id., at 158-60. Eighth, he observed appellee failed to hold entry-level jobs since he could not perform simple tasks. Id., at 161. Finally, given the

numerous incidents that occurred during appellee's childhood, Dr. Martell opined appellee satisfied the age-of-onset prong.   See id., at 179-82.

Appellee's second expert witness was Dr. Barry Crown.   A board-certified neuropsychologist, Dr. Crown concluded appellee suffers from intellectual disability under both the DSM-IV and AAIDD Manual definitions.   See N.T. Hearing, 4/18/13, at 189, 192, 206, 211.   Although covering all three Miller prongs, Dr. Crown's testimony largely focused on the first prong since he administered appellee's 2011 test, a WAIS-IV. Because the WAIS-IV uses a factorial-design model and assesses "fluid" intelligence,[7] Dr. Crown also labeled it as the "gold standard of [IQ] tests[.]"   Id., at 157.

Dr. Crown did not tell appellee the test was for Atkins purposes but admitted he stated he was there at the request of appellee's attorneys.   Id., at 167-68.   He mentioned appellee did not look depressed, anxious, or unmotivated.   See id., at 169-72.   Embedded measures within the WAIS-IV supported his visual observations. Specifically, he averred appellee's digit-span score demonstrated positive concentration and effort, see id., at 173, and opined depressed individuals generally score very low on the perceptual-reasoning factor,[8] id., at 170; appellee's highest factor-score, an 81, was in perceptual reasoning.   Id., at 177.   Moreover, like Dr. Martell, Dr. Crown disregarded the two prorated scores, the 1992 and 1997 tests, considering proration improper because it fails to account for all the areas that make up intelligence.   See id., at 178.

---

[7] Factorial design takes "the normative base and appl[ies] it to individual behavior[,] … look[ing] at the underlying factors that affect behavior and responses within the test." Id., at 160.   "Fluid" intelligence refers to the ability to think and solve problems in novel circumstances; in contrast, "crystallized" intelligence, which the previous Wechsler tests used, refers to the ability to solve problems from stored information.   Id., at 160-61.

[8] The perceptual-reasoning factor is one of four factors that make up the WAIS-IV; the other three are verbal comprehension, working memory, and processing speed.   Id., at 176.   Each factor contains two or three subtests.   See id., at 172, 177.

Dr. Crown reiterated the WASI requires four subtests and added that the exam warns against prorating for forensic purposes. Id., at 179. Accordingly, he determined appellee satisfied the first prong, stating application of a confidence interval[9] resulted in a score between 66 and 74. N.T. Hearing, 4/18/13, at 175-76.

As for the final two prongs, Dr. Crown considered appellee to be significantly limited in the same eight areas found by Dr. Martell. However, unlike Dr. Martell, Dr. Crown did not conduct interviews; instead, he based his findings on reviewing collateral information, such as affidavits and appellee's school, court, and medical records, a practice which Dr. Crown maintained is professionally acceptable. See id., at 200-02. Of note, Dr. Crown discussed functional academics in detail, underscoring the fact appellee was held back in seventh grade because that is when schools shift from concrete to abstract learning; individuals with intellectual disabilities are essentially stuck at the concrete level. See id., at 194-95. In light of the plethora of records and anecdotal references from appellee's youth, Dr. Crown also opined appellee satisfied the age-of-onset prong. See id., at 206.

On cross-examination, the Commonwealth first focused on appellee's incentive to purposely fail the 2011 test. Although agreeing one can exhibit sufficient effort yet intentionally select incorrect answers, Dr. Crown noted his experience revealed only "very smart people" can accomplish such a task. Id., at 218. In response to the Commonwealth's suggestion that had Dr. Armstrong found evidence of intellectual disability she would have pursued it, Dr. Crown stated neuropsychologists often give individual subtests because they are more interested in specific brain functions than an IQ score. See id., at 230, 232. He further characterized the WRAT as limited in

---

[9] Per Dr. Crown, a confidence interval translates an SEM, which changes depending on age and other factors, into a constant number. Id., at 175-76; see also Hall, at 1995.

scope, noting the latest WRAT was modified to measure comprehension, see id., at 239-45, and described the Commonwealth's connection between appellee's percentile ranks on the WRAT and 2011 test as "mixing apples and peanuts[.]"  Id., at 259.

The Commonwealth concentrated its adaptive-deficits questioning on functional academics, stressing appellee was never placed in special-education classes and his behavior issues coincided with his decrease in academic performance.  Id., at 247-52. In response, Dr. Crown reiterated the transition from concrete to abstract learning and stated boys, in particular, tend to act out when they struggle with the transition.  Id., at 252.  The Commonwealth also offered appellee's excessive absences — 61 times in seventh grade and 131 times in tenth grade — as a cause of his academic shortcomings. Id., at 254.  Although suggesting appellee's abusive stepfather may have contributed to the academic deficiencies during appellee's childhood years, Dr. Crown was unsure what caused the issues during appellee's teenaged years.  See id., at 254-56.

Appellee's first lay witness was his younger sister, Janet Whack.  She largely repeated the anecdotal references made by Dr. Martell, mentioning appellee's use of the phrase "like this, like that[,]" N.T. Hearing, 4/22/13, at 9-10, his inability to learn checkers and hide-and-seek, id., at 11-13, and his lack of direction, see id., at 19.  Whack noted she and her sisters would help appellee complete chores to prevent his stepfather from beating him.  Id., at 15-18.  Likewise, she tried to help her brother with schoolwork but grew frustrated because he could not comprehend the work and eventually completed it for him.  Id., at 13-14.  She recalled appellee's only friend was seven years younger than appellee and even he would take advantage of appellee.  Id., at 21-22, 25. Additionally, Whack confirmed appellee's inability to hold entry-level jobs for longer than a few days, id., at 25-27, and denied ever seeing him drive a vehicle, see id., at 32.  She suggested her brother never applied for a driver's license because he could not read.

Id., at 31-32. The Commonwealth fixed on prior statements Whack gave authorities that she witnessed appellee driving a Jeep on the night of the murder. See id., at 51-52. Whack denied the statement and reiterated she simply saw him in a vehicle. Id., at 52. Addressing the Commonwealth's inquiry into her brother's capabilities, she stated "he [could] fix a sandwich or turn on the TV[.] That's about it." Id., at 56.

Letitia Fletcher, a family friend, testified she lived with appellee on a sporadic basis when he was four to 11 years old. Id., at 146, 163. Fletcher echoed the accounts of appellee's deficiencies, discussing his problems getting dressed, his quiet personality, his abusive stepfather, and his inability to complete chores or play games. Id., at 147-55, 157-59. On cross-examination, the Commonwealth used Fletcher's testimony from the 1998 PCRA hearing to discredit her, noting she indicated she lived with appellee during his toddler years. See id., at 180-81. The Commonwealth also raised another statement from the 1998 hearing, wherein Fletcher recalled appellee struggled to write on a straight line while in middle school. Id., at 174-75. When asked how she was aware of issues during this period, Fletcher replied she "thought middle school was … from the first to the fifth grade." Id., at 176.

Appellee's last witness was his fifth-grade teacher, Alan Grolnic, who described appellee as a "memorable" student, id., at 227, in a class he considered the "most difficult" of his 25 years at appellee's elementary school, id., at 201, 203. Although appellee's class was not a special-education class, it contained the lowest-performing students and used second- and third-grade materials. Id., at 204-06, 208. In an attempt to motivate students and their parents, Grolnic would annotate that students were performing below their capabilities. See id., at 213, 270. According to Grolnic, he did not seek intellectual-disability testing for appellee because the administration informed him it would be "useless" and school psychologists were chiefly reserved for

younger children. See id., at 219-20, 223-24. Similarly, he did not consider holding appellee back, as school policy favored "social promotion[s]." See id., at 211.

The Commonwealth quoted Grolnic's 2011 affidavit, taken by appellee's counsel, wherein he stated appellee "was a quiet kid … and did[ not] stand out." Id., at 227. Upon further questioning about the affidavit, Grolnic admitted counsel informed him appellee would not be executed if the court determined he suffered from intellectual disability. Id., at 231-32. Inquiring into specific phrases used in the affidavit, e.g., "intellectually impaired" and "intellectually slow," the Commonwealth suggested he may have been prompted to use the phrases, id., at 235-39, and contrasted the statements with language he used in appellee's school progress reports; Grolnic was unsure whether he stated the phrases organically. See id., at 240-54.

The Commonwealth's only witness was Dr. Paul Spangler. A licensed psychologist and former director of Philadelphia's Clinical and Forensic Services for Mental Retardation Services, Dr. Spangler averred appellee did not suffer from intellectual disability. See N.T. Hearing, 4/23/13, at 27. He calculated appellee's IQ score at 78, utilizing the 1977 test individually because he thought it was the most reliable since it was a full-scale score and administered during appellee's youth. See id., at 80, 123. Despite reservations about the validity of certain scores, he also averaged all six scores to compute an IQ score of 75.3. Id., at 81.

Covering the six tests in turn, Dr. Spangler considered the 1976 test invalid, given its single reference in Dr. Andrews' report and uncertainty as to its type. Id., at 28-33. As for the 1992 test, Dr. Spangler agreed using prorated scores is generally unacceptable for diagnostic purposes but maintained subtest scores were still important for comparison purposes. See id., at 38-40. He also underscored that appellee's verbal score of 75 on the 1996 test was the same as the 1992 test. Id., at 43-45. Dr.

Spangler divulged he prorated the 1997 test, which Dr. Armstrong proctored, because he wanted to compare the score to appellee's other verbal scores. Id., at 45-47. Finally, Dr. Spangler did not consider the 2011 test reliable because (1) it was administered post-Atkins, (2) appellee's depression and ADD may have depressed the score, and (3) he did not think appellee put forth adequate effort. Id., at 48-55. Unlike Dr. Crown and Dr. Martell, Dr. Spangler analyzed effort by citing appellee's processing-speed score, one of the four factors on the WAIS-IV, and comparing various subtest scores between different tests. Id., at 68. Specifically, he mentioned appellee's lowest scores on the 2011 test were processing-speed subtests, id., at 56, and appellee's arithmetic score was a 7 on the 1996 test but a 4 on the 2011 test, id., at 57. Likewise, appellee scored a 7 and 9 on the similarities subtest, as part of the 1996 and 1997 tests, but a 5 on the 2011 test. Id., at 61. Dr. Spangler characterized appellee's digit-span scores, a 5 on the 1996 test and a 6 on the 2011 test, as "mediocre" and stressed appellee received higher scores on other subtests. Id., at 66.

Moreover, Dr. Spangler did not believe appellee suffered from significant limitations in adaptive functioning. See id., at 126. Primarily concentrating on functional academics, he explained his focus was on whether an individual can do something as opposed to whether he simply does not want to do it. See id., at 91. Thus, Dr. Spangler referenced appellee's behavioral and absentee issues, suggesting appellee's academic performance was linked to those problems. See id., at 91, 101-02. In contrast, when appellee's behavior was under control at New Life Boys' Ranch, he noted appellee's academic performance improved. Id., at 103-07. Dr. Spangler further claimed appellee's GED score contained an error and the actual score was 1930, not 193, positing that the percentile ranks for appellee's category scores did not equate to a total score of 193. See id., at 117-19.

Appellee's counsel initially questioned Dr. Spangler about appellee's DOC records, emphasizing the absence of formal assessments or references to learning disabilities. Id., at 141-44. Rebutting Dr. Spangler's processing-speed argument, counsel alluded to remarks by Dr. Andrews and Dr. Krop that appellee had issues with speed; Dr. Spangler responded that psychologists often couch statements in relative terms and suggested appellee's performance-component[10] score of 82 on the 1977 test belied Dr. Andrews' statement. See N.T. Hearing, 4/23/13, at 153-54. Further, Dr. Spangler conceded appellee's perceptual-reasoning score of 81 indicated "some effort[,]" but did not consider it as definitive of a marker as did Dr. Crown. See id., at 155-56. Likewise, Dr. Spangler agreed the digit-span subtest is sensitive to effort but did not think the scores were conclusive because they were in line with appellee's other subtest scores. See id., at 171-73. Rather, he considered adequate effort to be demonstrated by a score that is above one's average, citing appellee's visual-puzzles[11] score of 8. See id., at 174-77. Given the percentile ranks of the 1996 test score of 75 and the 2011 test score of 69, Dr. Spangler described the scores as "drastically different[.]" Id., at 167. In response to the Commonwealth's "cherry-picking" claim, he submitted it was critical that appellee failed to grasp the underlying concepts and had twice before answered the questions correctly. See id., at 178-82. Stressing the fact Dr. Spangler never conducted personal interviews, counsel quoted his testimony from previous Atkins hearings, wherein he remarked that gathering third-party information was vital. Id., at 196-98. Finally, Dr. Spangler acknowledged individuals with intellectual disability generally plateau at a sixth-grade level. Id., at 203-06.

---

[10] The performance component is one of two components on the WISC-R. See Psychological Summary, 2/24/77.

[11] A WAIS-IV subtest, visual puzzles fall under the perceptual-reasoning factor.

On January 10, 2014, the PCRA court issued an order vacating appellee's death sentence, finding appellee's IQ score was 74, he suffered from "major" deficiencies in adaptive functioning, and his impairments began before he turned 18. PCRA Court Order, 1/10/14. In calculating appellee's IQ score, the court averaged the 1977, 1996, and 2011 test scores, but disregarded the 1992 and 1997 test scores as all three experts agreed proration was generally unacceptable for Atkins purposes. See PCRA Court Opinion, 4/7/14, at 33. The court also rejected the 1976 test, determining appellee failed to prove the score arose from a full-scale test. Id. Further, the court concluded appellee suffered from major deficiencies in adaptive functioning, finding he was significantly limited in: (1) communication, (2) functional academics, (3) self-direction, (4) social/interpersonal skills, and (5) leisure.[12] Notably, in a footnote within its discussion of social skills, the court applied the Briseno factors[13] we first cited in Commonwealth v. DeJesus, 58 A.3d 62 (Pa. 2012). Observing that application of the factors was discretionary, the court analyzed the second and seventh factors, i.e., impulsiveness and forethought, citing appellee's description within the 1982 mental evaluation as

---

[12] Although it also determined appellee satisfied the AAIDD Manual's adaptive-deficit standard, the court, like the expert witnesses, primarily focused on the DSM-IV's criteria.

[13] See Ex parte Briseno, 135 S.W.3d 1, 8-9 (Tex. Crim. App. 2004) ("[(1)] Did those who knew the person best during the developmental stage — his family, friends, teachers, employers, authorities — think he was mentally retarded at that time, and, if so, act in accordance with that determination? [(2)] Has the person formulated plans and carried them through or is his conduct impulsive? [(3)] Does his conduct show leadership or does it show that he is led around by others? [(4)] Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable? [(5)] Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject? [(6)] Can the person hide facts or lie effectively in his own or others' interests? [(7)] Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?").

"impulsive[,]" noting the fact he set himself on fire, and stating Officer Boyle's death involved no "forethought or planning." PCRA Court Opinion, 4/7/14, at 41 n.25. As for the third prong, the court determined appellee satisfied the age-of-onset requirement based on the extensive testimony involving incidents before he was 18. Accordingly, the court held appellee suffered from intellectual disability and was thus not subject to imposition of a death sentence.

Presently, the Commonwealth appeals the PCRA court's decision, asserting appellee's "own evidence [is] mutually contradicting and cannot support the ruling[.]" Commonwealth's Brief, at 28 (citing Commonwealth v. Santana, 333 A.2d 876, 878 (Pa. 1975) ("'[T]estimony in conflict with incontrovertible physical facts and contrary to human experience and the laws of nature must be rejected.'" (citation omitted))). In support, the Commonwealth references testimony by appellee's expert witnesses from the 1998 PCRA hearing who denied appellee was intellectually disabled. In particular, the Commonwealth quotes Dr. Krop's statement that appellee's 1996 test score was outside the range of intellectual disability and he was "'not saying [appellee] is [intellectually disabled.]'" Id., at 28-29 (quoting N.T. Hearing, 4/20/98, at 122, 183). The Commonwealth further underscores Dr. Armstrong's statements that appellee was "'not [intellectually disabled,]'" and his IQ score fell within the "'borderline'" range, i.e., outside the range of intellectual disability. Id., at 29 (quoting N.T. Hearing, 4/27/98, at 95-96, 173, 190-91). Similarly, Dr. Edwin Camiel, the physician who conducted the 1982 mental evaluation, indicated appellee's "'thoughts progressed in a normal associative manner'" and he demonstrated an "'intact ability to think in abstract terms.'" Id. (quoting N.T. Hearing, 4/27/98, at 49).

The Commonwealth also claims appellee presented contradictory testimony concerning adaptive functioning, citing a discussion appellee had with Judge Sarmina,

id., at 32-33 n.9 (citing N.T. Hearing, 4/22/13, at 108), Dr. Crown's observations of appellee during his administration of the 2011 test, id., at 33 (citing N.T. Hearing, 4/23/13, at 239-46), and Dr. Camiel's aforementioned statements, id. (citing N.T. Hearing, 4/27/98, at 49). Accordingly, the Commonwealth reasons the PCRA court disregarded the record as a whole and its conclusion is unsupported as a matter of law.

As an analog to its contradictory-evidence claim, the Commonwealth proclaims "badges of fraud" taint this case. Id., at 35. It reiterates the contradictory testimony of appellee's own experts, notes his lowest IQ score were post-Atkins, states appellee initially refused to present intellectual-disability evidence, and suggests academic literature encourages medical professionals to broadly define intellectual disability to prevent the imposition of the death penalty. Continuing its fraud jeremiad, the Commonwealth levies an accusation of "judge shopping" and alludes to concerns with the integrity of appellee's counsel, the Federal Community Defender Office, id., at 39-40, a consideration that has not escaped the notice of this Court. See, e.g., Commonwealth v. Spotz, 18 A.3d 244, 329-30 (Pa. 2011) (Castille, C.J., concurring). As with appellee's intellectual-disability testimony, the Commonwealth proffers these peculiar circumstances "reinforce the conclusion that, under … Santana … the PCRA court['s ruling] should be set aside." Commonwealth's Brief, at 42.

In response, appellee maintains the PCRA court's decision complies with the standard of review because the record supports its findings and its conclusions are free from error. He submits the court's intellectual-functioning determination satisfied Miller because it calculated an IQ score of 74, which is acceptable under Miller. Specifically, appellee claims the court was warranted in discarding the 1992 and 1997 test scores because all three experts agreed proration was generally unacceptable. Although inclusion of the 2011 test was contested, he suggests the court's rationale for inclusion

was supported by the record, noting the court's criticism of Dr. Spangler's failure to meet with appellee, appellee's performance on the perceptual-reasoning factor and digit-span subtest, and the court's distrust of Dr. Spangler. Appellee also states the PCRA court complied with Williams' edict that limitations in adaptive functioning must be "major" where an IQ score falls within the SEM range, citing Dr. Martell's description of "empty speech[,]" which was corroborated by the lay witnesses, the fact he plateaued at a sixth-grade level, his lack of direction and inability to complete basic tasks, Dr. Camiel's diagnosis of "schizoid personality disorder[,]" and his inability to learn childhood games. Appellee's Brief, at 41-44. Noting Dr. Spangler did not challenge the age-of-onset prong, appellee avers the record plainly supports his impairments began before age 18.

Further, appellee contends the Commonwealth's Santana claim is meritless because intellectual disability was not at issue during the 1998 PCRA hearing and the experts indicated they were using a cutoff score of 70 when making their statements. Id., at 48-49. As Miller allows an IQ score of 75 or below, he submits the statements do not establish he presented self-contradicting evidence, and emphasizes none of his experts discussed adaptive functioning since the hearing was not meant to determine intellectual disability. As to the Commonwealth's fraud allegations, appellee argues they are waived because the Commonwealth did not raise them below. Moreover, he mentions even Dr. Spangler did not think he was malingering, the court rejected the Commonwealth's use of specific questions to demonstrate lack of effort, the reference to two medical journals does not establish fraud, and the attacks upon counsel's integrity are irrelevant and "in dispute." Id., at 55-57.

Our task is more straightforward than a psychological evaluation. We need only determine whether the PCRA court's findings are supported by substantial evidence and its legal conclusions are free from error. See Hackett, at 26 (quoting Williams, at 981).

Keeping in mind it was appellee's burden to prove each Miller prong by a preponderance of the evidence, see Miller, at 631 (citation omitted), we affirm the court's decision to vacate appellee's sentence of death.

Appellee has taken six IQ tests in his lifetime. N.T. Hearing, 4/17/13, at 38, 43, 46, 49, 62. Two of the scores, the 1992 and 1997 tests, were calculated by proration, and all three experts agreed proration is generally inappropriate for diagnostic purposes. Id., at 61-62, N.T. Hearing, 4/18/13, at 179, N.T. Hearing, 4/23/13, at 39; see also Williams, at 240 (citations omitted) (rejecting use of abbreviated Wechsler score for diagnostic purposes). Thus, the record contains substantial evidence to support the court's decision to disregard the two prorated scores. The court was also warranted in disregarding the 1976 test. Despite Dr. Martell's belief that the 1976 test was a full-scale WISC-R, see N.T. Hearing, 4/17/13, at 40-41, no evidence, other than a single sentence within Dr. Andrews' 1977 summary, see Psychological Summary, 2/24/77, references the test. Pertinently, the court's calculated average of 74 would remain unchanged even if that score was included.

Ultimately, the first prong turns on the inclusion of the 2011 test score; without it, appellee's IQ score averages 76.5. Here, the court chose to credit the testimony of Dr. Martell and Dr. Crown over Dr. Spangler. Specifically, it did not find Dr. Spangler's rationale for discarding the 2011 test score persuasive, concluding his first two reasons — presuming all post-Atkins tests to be unreliable and the references to depression and ADD — were speculative. The court noted he failed to cite to specific evidence to support his post-Atkins theory, he never met with appellee in person, and it did not think the ADD and depression references conclusively established appellee suffered from those conditions. PCRA Court Opinion, 4/7/14, at 34-35. Rather, the court mentioned appellee's perceptual-reasoning score, the fact appellee self-reported his depression,

and that Dr. Spangler failed to raise the depression and ADD arguments about appellee's other tests. Id. Addressing Dr. Spangler's third reason, appellee's purported lack of effort, the court did not deem Dr. Spangler's reference to specific questions as symbolic of poor effort, instead citing appellee's digit-span score. Id., at 36. Overall, the court simply distrusted Dr. Spangler, criticizing his interpretation of a six-point difference as "drastic" but a five-point difference as "natural variance." Id., at 35 n.22. Thus, like many Atkins cases, whether to include the 2011 test score amounted to a "battle of the experts." Cognizant of this realization, we adopted a deferential standard of review, see Hackett at 26 (quoting Williams, at 981), and the court was free to judge Dr. Spangler's credibility, which it supported with citations to the record. See Williams, at 992 (citing Commonwealth v. White, 734 A.2d 374, 381 (Pa. 1999)). Hence, we find the PCRA court's choice to include the 2011 test score is supported by substantial evidence, and its conclusion that appellee satisfied the first prong with an IQ score of 74 free from error.

With regard to the second prong, adaptive deficits, the court emphasized our language in Williams that deficits must be "major" where an IQ score falls within the SEM range, i.e., 71-75. PCRA Court Opinion, 4/7/14, at 36 (citing Williams, at 983). Curiously, the court took a numerical approach, observing the defendant in Williams was found to be significantly limited in seven of the 11 DSM-IV categories. Applying this logic, the court held appellee satisfied the "major" requirement because it found he was significantly limited in five areas: (1) communication, (2) functional academics, (3) self-direction, (4) social/interpersonal skills, and (5) leisure. First, the court cited appellee's pervasive use of the phrase "like this and like that[,]" and Dr. Martell's remark that appellee was one of the most communicatively deficient persons he ever interviewed. Id., at 37. Second, as to functional academics, it found appellee's

academic ceiling commensurate with individuals with intellectual disability, stating he "plateaued at a sixth-grade level[,]" the time when learning shifts from concrete to abstract. Id., at 39. The court disregarded Grolnic's testimony that was specific to appellee, acknowledging the Commonwealth's impeachment of Grolnic's testimony. Id., at 39 n.24. And, although the court recognized appellee's strength in word recognition, it emphasized the "weakness focus" of intellectual disability, further citing appellee's low GED score, poor writing ability, and the fact his younger sister would help him with schoolwork. Id., at 38. Moreover, while conceding appellee's scores improved at New Life Boys' Ranch, the court found he peaked at a sixth-grade level. Id., at 39. Third, the court found appellee significantly limited in self-direction, mentioning he would get lost in his own neighborhood and, despite facing punishment from his stepfather, he failed to complete basic tasks, such as buying the correct items from the store, retrieving cigarettes, sweeping, or collecting trash. Id., at 40. Fourth, evaluating social skills, the court stressed appellee has avoided social interaction his entire life and quoted Dr. Martell's characterization of appellee as a "loner[.]" Id., at 40-41. Additionally, the court alluded to statements within the 1982 mental evaluation, appellee's "gullibility[,]" and the age disparity between appellee and his only friend. Id., at 41-42. Fifth, in regard to leisure, the court noted appellee's inability to learn hide-and-seek or checkers. Id., at 42.

Dr. Spangler appears to be correct that appellee's GED subtest percentile ranks do not align with a total score of 193, where the minimum total-passing score was 2250, see GED Transcript, 3/16/11; however, substantial evidence still supports the court's functional-academic finding. Namely, appellee was retained in seventh grade — around the time when schools shift to abstract learning, N.T. Hearing, 4/18/13, at 194-95; N.T. Hearing, 4/23/13, at 203-06 — and despite the individual attention he received at

New Life Boys' Ranch, his scores still peaked at roughly a sixth-grade level, see N.T. Hearing, 4/18/13, at 68-69; Academic Record, 4/7/78, at 2.

We also find substantial evidence supports the court's communication finding. While the Commonwealth cites a conversation appellee had with Judge Sarmina, see N.T. Hearing, 4/22/13, at 108, the court was free to credit Dr. Martell's assessment of appellee's speech, the basis of which included listening to prison recordings, interviewing appellee, and reviewing statements by those who knew appellee during his youth. See N.T. Hearing, 4/17/13, at 94-95, 116-17, 123-25. Substantial evidence is not an overwhelming burden. See Chapman v. Commonwealth, Pennsylvania Board of Probation & Parole, 484 A.2d 413, 416 (Pa. Cmwlth. 1984) ("'Substantial evidence' has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (citations omitted)). Accordingly, it was not unreasonable for the court to deem Dr. Martell's detailed methods "adequate" to find appellee was significantly limited in communication. See id.

As for the remaining areas — self-direction, social skills, and leisure — the court relied heavily on the testimony of Whack and Fletcher, recalling appellee would get lost in his own neighborhood, was easily taken advantage of, could not complete basic tasks despite punishment from his stepfather, and could not play childhood games. Although a review of the record shows the hearing was not thoroughly focused on these witnesses' credibility, see N.T. Hearing, 4/22/13, at 51-56, 95-128, 174-81, such determinations are strictly within the province of the PCRA court. See White, at 381 ("[I]t should be noted that in the past this Court has found that there is no justification for an appellate court, relying solely upon a cold record, to review the fact-finder's first-hand credibility determinations." (citations omitted)). Furthermore, "less biased" accounts, e.g., Dr. Camiel diagnosing appellee with schizoid personality disorder, support the

court's findings. Thus, we conclude the court's adaptive-deficit findings are supported by substantial evidence. Finally, as the record is replete with instances from appellee's youth, the court's age-of-onset determination is also supported by substantial evidence.

In regard to the court's discussion of Williams' "major" requirement, we did not intend for courts to apply a mathematical approach, and did not make such a suggestion in Williams. While five out of 11 areas may satisfy the second prong in some circumstances, the task of the PCRA court is to examine the areas in a qualitative, not quantitative manner, cognizant that the burden is on the individual to prove each prong by a preponderance of the evidence. Although some assessments attempt to quantify adaptive deficits, see AAIDD Manual, at 43, the trial court retains ultimate responsibility for ensuring one proves he is significantly limited in adaptive functioning; this task becomes especially vital when an IQ score falls within the SEM range.

We further agree the Commonwealth's Santana claim is not availing. Santana applies to "testimony [that] conflict[s] with … incontrovertible physical facts and … the laws of nature[.]" Santana, at 878 (citation omitted). Notably, that case arose from an officer's testimony that he witnessed the defendant leave a specific area, but "undisputed physical facts" refuted the officer's statement. Id. Far from being against the "laws of nature[,]" the testimony by appellee's witnesses at the first PCRA hearing reveals they made their intellectual-disability statements on the basis of an IQ score cutoff of 70. See, e.g., N.T. Hearing, 4/27/98, at 173 (stating "70 and below is [intellectually disabled]"). Accounting for the SEM, an IQ score between 70 and 75, or below, satisfies the first prong. See Miller, at 630-31. Thus, appellee's expert witnesses' testimonies, vis-à-vis the 1998 and 2013 hearings, do not establish he presented self-contradicting testimony on intellectual disability. We also deem it relevant that the 1998 hearing was not about intellectual disability; rather, it concerned appellee's

ineffectiveness claims based on assertions of brain damage and mental illness. See PCRA Court Opinion, 7/28/98, at 24-25. Therefore, we cannot credit the Commonwealth's Santana claim.

The Commonwealth next asks us to alter Miller's framework to "protect the justice system from the risk of fraud and manipulation[.]" Commonwealth's Brief, at 43. Observing the medical definition of intellectual disability was designed for treatment, not capital litigation, and individuals have a strong incentive to testify favorably for those seeking Atkins relief, the Commonwealth requests we make application of the Briseno factors mandatory and prohibit intellectual disability claims by individuals who have a previous IQ score above 75. We rejected the identical arguments in Hackett. See Hackett, at 35-36. The Commonwealth criticizes the PCRA court's discussion of Briseno, arguing appellee's act of setting himself on fire was to prevent police from shooting him and the shooting was a "hastily devised criminal scheme[.]" Commonwealth's Brief, at 46-47. In support of its cutoff-score argument, the Commonwealth cites an Oklahoma statute, 21 Okla. Stat. Ann. § 701.10b(C), which employs the prohibition, avowing such a practice would "quell feigning defendants and overreaching experts[.]" Commonwealth's Brief, at 47-48. Cognizant of the High Court's decision in Hall, which struck down Florida's cutoff score of 70, Hall, at 1990, the Commonwealth posits the proposed prohibition would not violate Hall because Hall only applies to cutoff scores that do not account for the SEM.

Appellee asserts the Commonwealth's requests to change the law are waived for failure to raise them below. Notwithstanding waiver, he argues the PCRA court's Briseno analysis is irrelevant because the Commonwealth did not allege he was malingering. Alternatively, he claims the Commonwealth has failed to prove the court's Briseno findings were not supported by the record and submits Briseno has largely been

vitiated by <u>Hall</u>'s emphasis on clinical definitions for determining intellectual disability. As for the Commonwealth's cutoff-score claim, appellee argues such a framework would violate <u>Hall</u>, observing the petitioner in <u>Hall</u> had previously scored above a 75 and the decision prohibits "standards that are contrary to accepted clinical practice." Appellee's Brief, at 62-63. Because no clinical practice supports the proposed prohibition, appellee submits adopting the practice would conflict with <u>Hall</u>.

We decline to accept the invitation to revisit <u>Miller</u>. We denied the same request in <u>Hackett</u> because the request was moot since we reversed the court's decision to vacate that appellee's death sentence, <u>see</u> <u>Hackett</u>, at 36, but do not think our affirmance here necessitates a different result. With regard to the <u>Briseno</u> argument, it is significant that the Commonwealth's own witness, Dr. Spangler, did not think appellee was malingering. N.T. Hearing, 4/23/13, at 156 ("I don't think he was malingering."). In <u>DeJesus</u>, we welcomed the use of the <u>Briseno</u> factors after quoting the PCRA court's remark that it found the Commonwealth's malingering argument "'compelling[,]'" noting the factors "appear to be particularly helpful in cases of retrospective assessment of [intellectual disability.]" <u>DeJesus</u>, at 86. Instantly, this PCRA court's discussion of the <u>Briseno</u> factors was not vital to its conclusion, nor did it credit the Commonwealth's malingering claim as the court did in <u>DeJesus</u>. Hence, the Commonwealth's <u>Briseno</u> arguments must fail, and we decine to make application of the factors mandatory.

Likewise, we decline the Commonwealth's request to prohibit individuals with a prior IQ score of 76 or above from asserting intellectual disability. Although <u>Hall</u> does not foreclose such a framework, <u>see</u> <u>Hall</u>, at 1996 (noting opinion does not address cutoff scores "at 75 or greater"), the Oklahoma cutoff score, as well as those of many other states, <u>see</u> <u>id.</u>, at 1996-97, is a creature of the legislature. As noted <u>supra</u>, we reluctantly waded into these waters because of the General Assembly's inaction. We

have little doubt there is a significant concern that some individuals may malinger or put forth minimal effort, see DeJesus, at 85 ("The prospect of malingering and the incentive to slant evidence to influence a finding … are relevant[.]"); however, by the Commonwealth's own admission, malingering was not a concern here.  And, although references to subtest scores and depression notations essentially assert appellee was "not giving [his] best effort[,]" reasonable testimony allows a contrary conclusion.  See N.T. Hearing, 4/17/13, at 83-84; N.T. Hearing, 4/18/13, at 173-75.  Thus, while sympathetic to the Commonwealth's position, we believe the remedy sought must emanate from the General Assembly.

In sum, as the PCRA court's findings are supported by substantial evidence and its legal conclusions are free from error, we affirm the order vacating appellee's death sentence.

Order affirmed; jurisdiction relinquished.

Mr. Chief Justice Saylor, Mr. Justice Baer and Madame Justice Todd join the opinion.

Mr. Justice Stevens files a dissenting opinion.