**[J-18-2015]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 696 CAP |
| | : |
| Appellee | : Appeal from the Order of the Court of |
| | : Common Pleas of Fayette County, |
| | : Criminal Division, entered on January 17, |
| v. | : 2014 at No. CP-26-CR-0001229-2004 |
| | : |
| | : SUBMITTED:  February 11, 2015 |
| JAMES VANDIVNER, | : |
| | : |
| Appellant | : |

**OPINION**

**MADAME JUSTICE TODD**                    **DECIDED:  December 29, 2015**

In this capital case, Appellant James VanDivner appeals the order of the Fayette County Court of Common Pleas denying his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  For the reasons that follow, we vacate the order of the PCRA court and remand for a supplemental opinion consistent with this opinion.

## I.  Background

In July 2004, Appellant fatally shot his fiancée, Michelle Cable.  We summarized the facts surrounding the murder in our opinion on Appellant's direct appeal:

> Jessica Cable and her mother Michelle Cable lived at 100 East Second Street, Grindstone, Fayette County. On July 5, 2004, Jessica was babysitting at a neighbor's home. Between 8:30 and 9:00 p.m., Jessica saw [A]ppellant driving in the direction of her home and immediately ran home. When she arrived, she saw [A]ppellant get out of his vehicle

and walk to the back porch of her home. As Jessica followed, [A]ppellant entered the home through the back door and, while walking through the home, encountered a family friend, Larry Newman, in the living room. Appellant asked Larry where Michelle was, and Larry pointed to the front door. Appellant then opened the door and walked onto the sun porch.

On the steps leading to the sun porch from the outside, [A]ppellant met Michelle and her son, Billy Cable. As [A]ppellant walked onto the porch, Billy told him, "Dude, get off my property." Notes of Testimony ("N.T."), 2/7/07, at 36. Appellant then pointed a gun at Michelle, at which point, Billy pounced on [A]ppellant in an attempt to wrestle the gun from his hand. Appellant managed to keep the gun and pointed it at Larry Newman's head. Larry's relative, Kenneth Newman, then rushed [A]ppellant, and the gun fired. Appellant, who still had the gun, walked quickly to Michelle and told her he was going to kill her. He grabbed her by the hair, shot her in the head, and, as she fell to the ground, stated, "There, you bitch, I said I was going to kill you." Id. at 39. Appellant smiled and walked away. A motorist who was passing by saw [A]ppellant grab Michelle by the hair and shoot her in the head.

Meanwhile, after unsuccessfully attempting to take the gun from [A]ppellant, Billy had gone inside the home to look for a weapon to protect his family. When he was unable to find a weapon, he left the home. As he stepped off the back porch, Billy saw [A]ppellant walking toward him with the gun in his hand. Appellant pointed the gun at Billy, who turned to run away. Appellant shot Billy in the neck and then left the scene. Police subsequently apprehended [A]ppellant in a field and recovered a Jennings J22 handgun. As [A]ppellant was being taken into an interview room at the Pennsylvania State Police barracks, he blurted out to Trooper James Monkelis, "This is a death penalty case and I don't want the needle, life for a life. Tell the DA I will plead guilty to life. I would have killed myself if I knew Michelle was dead." N.T., 2/8/07, at 255.

Commonwealth v. VanDivner, 962 A.2d 1170, 1173-74 (Pa. 2009).

Prior to trial, Appellant filed a motion to preclude the Commonwealth from seeking the death penalty, contending Appellant is intellectually disabled[1] and has significant limitations in adaptive skills, and, thus, that imposition of the death penalty would constitute cruel and unusual punishment under Atkins v. Virginia, 536 U.S. 304 (2002) (holding the Eighth Amendment to the United States Constitution prohibits imposition of the death penalty upon "mentally retarded criminals"). The trial court conducted a four-day hearing, after which it determined that Appellant failed to establish that his intellectual disabilities manifested prior to age 18, as required by Commonwealth v. Miller, 888 A.2d 624 (Pa. 2005) (explaining that a determination of intellectual disability requires proof of three elements: limited intellectual functioning, significant adaptive limitations, and onset prior to age 18). Given this determination, the court declined to make a determination of whether the first two elements set forth in Miller were established.

The jury convicted Appellant of first-degree murder for the death of Michelle; criminal attempt to commit criminal homicide with respect to Billy; and the aggravated assault of Larry Newman.[2] At the conclusion of the penalty hearing, the jury found two aggravating circumstances: (1) in the commission of the offenses, Appellant knowingly created a grave risk of death to another person in addition to the victim;[3] and (2)

---

[1] Previously, the term "mental retardation" was commonly utilized by the professional community and courts in addressing Atkins challenges. However, in Hall v. Florida, 134 S.Ct. 1986, 1990 (2014), the high Court recognized that the preferred term is "intellectual disability." Accordingly, in this opinion, we will use the term "intellectual disability," unless we are quoting from, *inter alia*, cases or notes of testimony. See Commonwealth v. Bracey, 117 A.3d 270, 271 n.1 (Pa. 2015).

[2] Appellant was represented at trial and on direct appeal by Susan Ritz Harper, Esquire. Appellant was also represented at the penalty phase of his trial by Dianne Zerega, Esquire.

[3] 42 Pa.C.S. § 9711(d)(7).

Appellant had a significant history of felony convictions involving the use or threat of violence.[4]  The jury found one mitigating circumstance related to Appellant's character and the circumstances of his offense (the "catchall" mitigator),[5] but concluded the aggravating circumstances outweighed the mitigating circumstance, and recommended a sentence of death.  On February 12, 2007, the trial court formally imposed a death sentence on the murder conviction, and consecutive terms of 20 to 40 years imprisonment for attempted homicide and 10 to 20 years imprisonment for aggravated assault.

This Court affirmed Appellant's judgment of sentence on January 23, 2009.  Commonwealth v. VanDivner, supra.  In so doing, we rejected Appellant's challenges to the sufficiency and weight of the evidence, several of the trial court's evidentiary rulings, and the trial court's determination that Appellant was not intellectually disabled.  On July 20, 2010, Appellant filed a pro se PCRA petition.  Following the appointment of counsel, amended petitions were filed on May 25, 2012 and October 17, 2012, wherein Appellant raised numerous issues relating to, inter alia, the weight of the evidence, the prosecutor's conduct, the trial court's evidentiary rulings, the trial court's jury instructions, counsel's alleged ineffectiveness, and Appellant's mental capacity.  Following four days of hearings,[6] the PCRA court denied Appellant relief on January 17, 2014.  This appeal followed.

## II.  Analysis

---

[4] 42 Pa.C.S. § 9711(d)(9).
[5] 42 Pa.C.S. § 9711(e)(8).
[6] Hearings were conducted on October 24, 2012; November 16, 2012; January 30, 2013; and February 28, 2013.  The Honorable Gerald R. Solomon presided over Appellant's trial and his PCRA proceedings.

In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is "supported by the record and free of legal error." Commonwealth v. Rainey, 928 A.2d 215, 223 (Pa. 2007). To qualify for relief under the PCRA, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S. § 9543(a)(2); that his claims have not been previously litigated or waived; and that the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational, strategic, or tactical decision by counsel. Id. § 9543(a)(3), (a)(4). An issue is previously litigated if "the highest appellate court in which [the petitioner] could have had review as a matter of right has ruled on the merits of the issue." Id. § 9544(a)(2).

In order to obtain relief under the PCRA based on a claim of ineffectiveness of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth in Strickland v. Washington, 466 U.S. 668 (1984). In Pennsylvania, we have applied the Strickland test by requiring a petitioner to establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. Commonwealth v. Pierce, 786 A.2d 203, 213 (Pa. 2001). Counsel is presumed to have rendered effective assistance, and, if a claim fails under any required element of the Strickland test, the court may dismiss the claim on that basis. Commonwealth v. Ali, 10 A.3d 282, 291 (Pa. 2010).

To prevail on a claim that trial counsel was ineffective for failing to present a witness, the petitioner must prove that: (1) the witness existed; (2) counsel was either aware of or should have been aware of the witness's existence; (3) the witness was willing and able to cooperate on behalf of the defendant; and (4) the proposed testimony

was necessary to avoid prejudice to the petitioner. Commonwealth v. Tharp, 101 A.3d 736, 757 (Pa. 2014).

In this appeal, Appellant raises claims pertaining to his pre-trial, guilt, and penalty-phase proceedings. However, we begin with Appellant's claim that he is not eligible for the death penalty under Atkins and Miller because our resolution of this claim will dictate whether we review Appellant's remaining claims.[7]

As noted above, in Atkins, the United States Supreme Court held that the Eighth Amendment to the United States Constitution prohibits imposition of the death penalty upon individuals with intellectual disabilities. 536 U.S. at 321. However, the Atkins Court "left the determination of how to apply the ban on the execution of mentally retarded defendants convicted of capital crimes to the individual states." Miller, 888 A.2d at 629.

We considered in Miller the definition of intellectual disability used by the American Association of Mental Retardation ("AAMR"), now the American Association on Intellectual and Developmental Difficulties ("AAIDD"), and the American Psychiatric Association ("APA") standard set forth in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) ("DSM–IV"). The AAMR defines intellectual disability as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." Id. at 629-30 (quoting Mental Retardation: Definition, Classification, and Systems of Supports 1 (10th ed. 2002)). The APA's definition, as set forth in the DSM–IV, defines

---

[7] A determination that Appellant is not eligible for the death penalty under Atkins and Miller would result in Appellant's sentence being vacated. As non-capital cases are within the jurisdiction of the Superior Court, see Commonwealth v. Gibson, 925 A.2d 167, 171 (Pa. 2007), we will defer review of Appellant's guilt-phase and penalty-phase claims pending the PCRA court's determination of Appellant's eligibility for the death penalty under Atkins/Miller.

"mental retardation" as "significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." Miller, 888 A.2d at 630 (quoting DSM-IV at 37).

We noted in Miller that the above definitions share three concepts: limited intellectual functioning, significant adaptive limitations, and onset prior to age 18. Regarding the concept of limited intellectual functioning, we explained:

> Limited or subaverage intellectual capability is best represented by IQ scores, which are approximately two standard deviations (or 30 points) below the mean (100). The concept should also take into consideration the standard error of measurement (hereinafter "SEM") for the specific assessment instruments used. The SEM has been estimated to be three to five points for well-standardized measures of general intellectual functioning. Thus, for example, a subaverage intellectual capability is commonly ascribed to those who test below 65-75 on the Weschler scales.

Id. at 630 (citations omitted).

Recognizing that, pursuant to both the AAMR and DSM-IV, a low IQ score is not, in and of itself, sufficient to support a classification of intellectually disabled, we considered the factors relevant to the second prong − the existence of limitations in adaptive behavior:

> Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives, and limitations on adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life. The AAMR recommends that such limitations should be established through the use of standardized measures. "On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or

practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills."

Id. at 630-31 (citations and footnote omitted). Under the AAMR, conceptual skills include language and money concepts; social skills include responsibility and the ability to follow rules; and practical skills include meal preparation and money management. Id. at 630 n.8.[8]

This Court did not discuss at length in Miller the third concept − age of onset − stating, "[w]e see no need to explore the concept of age of onset further, since this requirement is self explanatory and both the AAMR and the DSM-IV require that the age of onset be before age 18." Id. at 630 n.7.

In sum, we stated:

> What is clear from the above is that [the AAMR and the DSM-IV] definitions are very similar and diagnosis under either system of classification takes into account like considerations. Therefore, we hold that a PCRA petitioner may establish his or her mental retardation under either classification system and consistent with this holding, assuming proper qualification, an expert presented by either party may testify as to mental retardation under either classification system. Moreover, consistent with both of these classification systems, we do not adopt a cutoff IQ score for determining mental retardation in Pennsylvania, since it is the interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental retardation.

Id. at 631.

### A. Constitutionality of Age of Onset Requirement

---

[8] Similarly, the DSM-IV requires significant limitation in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. Id.

We first address Appellant's contention that the pre-18 age of onset requirement violates the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, Appellant argues:

> Under Atkins, two justifications for the death penalty − retribution and deterrence of future capital crimes − are not met by the execution of individuals with [intellectual disabilities]. Executing someone with limited intellectual functioning and significant adaptive functioning, but without proof of pre-18 onset does not further these policies. Requiring [Appellant] to prove his [intellectual disabilities] existed before age 18 violates his constitutional rights under the Eighth and Fourteenth Amendments.
>
> [Intellectually disabled] individuals suffer the same cognitive, emotive, and adaptive shortfalls, irrespective of the age-of-onset of their impairment. [Appellant] should not face death simply because courts concluded he could not show his limitations existed prior to age 18 or because these limitations developed when he was 18 or older.
>
> \*\*\*
>
> The age-of-onset requirement also violates the Equal Protection Clause of the Fourteenth Amendment. This means two defendants with identical intellectual disabilities who commit identical crimes, but who have different ages of onset, could get different sentences solely because of the differing date of onset.

Appellant's Brief at 43-45.

As a preliminary matter, we note that Appellant does not couch this issue in terms of an ineffectiveness of counsel claim. Further, Appellant does not identify where he raised this claim in his amended PCRA petitions. Finally, as the PCRA court observed, this Court considered and rejected Appellant's Eighth Amendment claim on direct appeal, stating:

> [A]ppellant argues that it would constitute cruel and unusual punishment to subject him to the death penalty simply

because he can present no IQ testing from his school years. Appellant contends that his present limitations, whether or not they began prior to age eighteen, should render him ineligible for the death penalty. His argument, in essence, is that a murderer who is mentally deficient to the same extent as a murderer who has been found to be mentally retarded should be similarly exempt from capital punishment. The trial court rejected this claim, finding that there is no national consensus that mentally deficient individuals should be entitled to the same exemption as those found to be mentally retarded. In addition, the court noted that the Atkins Court made it clear that not all defendants who claim to be mentally retarded fall within the range of mentally retarded offenders about whom there exists a national consensus against capital punishment. Atkins, 536 U.S. at 317, 122 S.Ct. 2242.

***

To the extent [A]ppellant raises this issue under the Eighth Amendment, we would not be inclined, in the absence of legislative direction, to extend Atkins beyond its express command. Atkins imposed a national rule upon all of the States, removing the authority to impose the death penalty upon a narrow class of capital defendants. Notably, however, the High Court did not establish a national standard for mental retardation, thus recognizing (and implicitly approving) a certain amount of flexibility under the Atkins rule. This fact, we believe, weighs heavily against a unilateral judicial action extending Atkins to other scenarios, particularly where, as here, [A]ppellant offers no evidence of a national consensus for prohibiting the execution of those who are mentally deficient but who do not meet the definition of mentally retarded.

VanDivner, 962 A.2d at 1189. Accordingly, as Appellant's age-of-onset claim under the Eighth Amendment was previously litigated on direct appeal, and, further, as Appellant failed to raise his age-of-onset claim under the Eighth and Fourteenth Amendments in

his amended PCRA petitions, we hold that the PCRA court did not err in denying him relief on this claim. See 42 Pa.C.S. § 9544(a)(2).[9]

## B. Age of Onset of Appellant's Intellectual Disability

Appellant next contends that the PCRA court erred in denying him relief based on his claim that trial counsel was ineffective for failing to present evidence that would have established that his intellectual disabilities manifested prior to the age of 18, as required by Miller.

In analyzing Appellant's claim, initially we consider the evidence that Appellant presented at his pretrial hearing to support his claim that he was intellectually disabled. Appellant first presented the testimony of Dr. Lawson Frederick Bernstein, Jr., a clinical and forensic neuropsychiatrist, who performed a neuropsychiatric evaluation of Appellant, which included an MRI and EEG. Dr. Bernstein testified that, in addition to the results of the tests administered to determine Appellant's intellectual functioning, which are discussed below, he considered Appellant's "functional capacity," and observed:

> there are many areas of [Appellant's] life where he has always functioned in a very poor, really subnormal, range; and I should note that people who are mildly mentally retarded can hold a job and can work, so I'm not referring to

---

[9] Appellant has filed a Petition to Allow Post-Submission Communication, noting that, on June 18, 2015, the United States Supreme Court issued a decision in Brumfield v. Cain, 135 S. Ct. 2269 (2015), wherein the high Court discussed the requirements of a successful claim of intellectual disability under Atkins v. Virginia, 536 U.S. 304 (2002), and, in particular, the age of onset. Appellant requests an opportunity to present additional argument with respect to Brumfield. The Commonwealth, by letter, has objected to Appellant's request without explanation. Upon review, we find that the Brumfield decision does not purport to alter the age of onset requirement accepted in Atkins and Miller, nor does it change our analysis or conclusions regarding Appellant's claim on direct appeal. Accordingly, we deny his petition to present additional argument.

that, per se, but he has a poor memory, he has very poor decision-making skills, he has no financial acumen that I can tell, in terms of managing his own affairs. He just -- his level of functioning is very consistent, and is readily explained by the actual numerical IQ scores. It's reflected in his limited, or subnormal, capacity in these various domains, behavioral domains. . . . He's not only a very poor historian, but a very poor communicator. His uses [sic] of syntax and grammar is exceedingly poor. He has a difficult time explaining complex concepts, and basically can't do it.

N.T. Pretrial Hearing, 11/27/06, at 11-12. Dr. Bernstein also noted that Appellant's "self-care is exceedingly poor." Id. at 12.

Based on his evaluation, Dr. Bernstein diagnosed Appellant with, *inter alia*, "mild mental retardation, dementia, due to head trauma and cerebral vascular disease of mild to moderate severity, [and] a history of childhood learning disabilities," id. at 8, and opined that Appellant's "IQ-related deficits, that the mental retardation aspect of his diagnoses, were present well prior to his 18th birthday." Id. at 13.[10]

Appellant also presented the testimony of psychologist Adam Sedlock. Sedlock testified that, on September 1, 2006, he administered the Wechsler Adult Intelligence Scale (3rd ed.) test to Appellant, who scored within the borderline range of 66-76 for verbal IQ; within the mentally deficient range of 60-70 for performance IQ; and within the mildly retarded range of 61-71 for full-scale IQ. Id. at 68. Sedlock further testified that he administered the Wide Range Achievement Test to Appellant, and that Appellant obtained a sight/reading grade rating at the second grade level; a spelling grade rating at the first grade level; and an arithmetic grade rating at the second grade level. Id. at 71. In the Weschler Memory Scales test administered by Sedlock, Appellant scored within the mild range of impairment in the area of auditory immediate memory, in the

_____

[10] Dr. Bernstein testified that, "separate and apart from his mental retardation," the MRI revealed that Appellant also had suffered a series of small strokes. Id. at 14.

moderate range of impairment in the area of visual immediate memory, and in either the mild or moderate range of impairment in other areas. Id. at 73-74. Sedlock testified that he administered the Bender-Gestalt test to determine whether there are organic features affecting Appellant's brain, and he concluded that "organic issues are resulting in his mental retardation." Id. at 75. Sedlock indicated that he administered the Stroop Word Color Test, the result of which revealed that Appellant has "significant deficit in the frontal lobe area of the brain." Id. at 76. On the Vineland Adaptive Behavior Scales test, which measures an individual's ability to adapt or adjust to situations within his or her environment, Appellant scored within the mild range of mental impairment. Id. at 77. Sedlock opined that Appellant was not capable of scheduling or keeping his own appointments, managing a checkbook, reading a newspaper, or finding a name in a telephone directory, although Appellant would be capable of writing a "simple sentence" and possibly reading "simple directions." Id. at 77-82. Ultimately, Sedlock concluded that Appellant was mentally retarded. Id. at 84.

In addition to the above testimony, Appellant offered into evidence a "permanent student record" from the Frazier School District and a report card from Mary Fuller Frazier Memorial High School for the school year 1964-1965, when Appellant was in the 10th grade. To authenticate the documents, Appellant presented the testimony of Ann Peters, the current supervisor of the Fayette County Special Education Program, who testified that Appellant was a student in the Frazier School District in 1964 and 1965. Id. at 53. Peters noted that the report card identifies Appellant as being in 10th grade "Special," and indicates that he attended only 36 of the required 128 days of school. Id. at 55, 60. She further noted that the permanent student record for Appellant lists only information for the 1964-1965 school year. Id. at 60. When asked how a student would be placed in the Special Education Program, Peters stated "[t]here was no formalized

evaluation procedure for placement of students in the special ed. class in '64 and '65," and asserted that a student who demonstrated "a lack of success academically" might be referred to the special education class "which was usually within the same building, maybe down the hall." Id. at 56.

Finally, Appellant presented the testimony of several lay witnesses. Loura VanDivner, Appellant's ex-wife, testified that she was married to Appellant for a year and a half from 1983 to 1984, and that, during that time, Appellant did not work, and was unable to dial a telephone, look up a number in the telephone book, prepare a meal, do laundry, shop, use simple tools, make simple home repairs, read the newspaper, manage money or pay bills. N.T. Pretrial Hearing, 11/29/06, at 102-10. She testified that Appellant "could write, but not no sentence, or anything." Id. at 104.

Appellant's sister, Alice Lisanti, testified that Appellant "was in special education classes in school," id. at 124, and that "[h]e couldn't read, he couldn't write, he couldn't add. He had problems doing the schoolwork." Id. at 127. She testified that Appellant "couldn't pronounce words properly," id., and that, while Appellant was in school, other children "made fun of him because of his learning abilities," and called him names. Id. at 128-29. Appellant's aunt, Trillis Cronin, similarly testified that Appellant could not read, write, do math, or spell. Id. at 164-66.

To rebut Appellant's assertion that he was intellectually disabled, the Commonwealth introduced evidence that Appellant had worked as a truck driver and, in 1992, passed a "recertification test" in order to obtain a Commercial Driver's License ("CDL"). Id. at 173. Ronald W. Beatty, Jr., a regional manager with the Pennsylvania Bureau of Driver Licensing, testified that the CDL test was written and consisted of 70 multiple choice questions. Id. at 174.

The Commonwealth also presented the testimony of Dr. Bryan Wright, a psychiatrist. Dr. Wright testified that, while Appellant told him he could not read, write, or perform mathematical tasks, Appellant was able to tell him how many quarters are in a dollar and how many points a touchdown is worth. N.T. Pretrial Hearing, 12/8/06, at 216. Dr. Wright noted that, when asked to make up and write a sentence, Appellant initially told Dr. Wright he was unable to do so; however, after repeated requests, Appellant wrote "I love you." Id. at 234. Dr. Wright testified that Appellant correctly spelled the word "food" and "money," but misspelled "truck" and "beer." Id. at 242-43. Dr. Wright also testified that Appellant told him that he was able to work outside clearing snow. Id. at 247.

Additionally, Dr. Wright testified that Appellant had told him that he had failed the CDL test several times, but eventually passed it by taking it over the phone, and that Appellant's route was a regular route between Pittsburgh and New Jersey. N.T. Pretrial Hearing, 12/8/06, at 214. However, Appellant's sister, Mildred Patton, testified that Appellant never made trips in the truck alone, and that one of Appellant's girlfriends or brothers always accompanied him. N.T. Pretrial Hearing, 1/11/07, at 323.

Dr. Wright explained that he diagnosed Appellant with, *inter alia*, a history of small strokes, prior head trauma, cerebrovascular disease, possible dementia, cognitive impairment, antisocial personality disorder, and a possible learning disorder. N.T. Pretrial Hearing, 12/8/06, at 217, 237, 245. Dr. Wright opined, however, that Appellant "does not have a diagnosis of mental retardation." Id. at 250. In support of his conclusion, Dr. Wright cited his belief that Appellant did not perform to his full potential on the tests; his opinion that Appellant understated his ability to read and write, and the fact that an individual who is completely illiterate is not necessarily retarded; that Appellant has multiple risk factors for the development of cognitive impairment later in

life; and that, "in order to make a diagnosis of mental retardation, somebody has to have evidence of cognitive impairment as tested by a trained psychologist on an approved tool, examination tool, prior to 18 years of age," which did not exist for Appellant. Id. at 250-53.

Based on the evidence presented at the hearings, the trial court determined that Appellant failed to demonstrate that his intellectual disabilities existed prior to the age of 18. The trial court noted that documented results of IQ testing are "the best evidence to establish the existence of the 'age of onset' prong," but recognized that other types of evidence, such as school records, social service records, and psychological records, could also be introduced to prove that an intellectual disability manifested prior to age 18. Trial Court Opinion on Pretrial Motion, 1/24/07, at 9-10. However, with regard to the school records introduced by Appellant, the trial court concluded:

> the school records . . . do not identify [Appellant] as mentally retarded. Further, there is no indicia that [Appellant] was placed in special education for mental retardation. Frazier School District Special Education Supervisor Ann Peters testified at the pre-trial hearings that, at the time [Appellant] was in school, there was no formalized procedure for placement in special education. Moreover, the sister of [Appellant], Mildred Patton, who is functioning normally, testified that she was placed into special education with her brother because of behavioral problems, not mental retardation. Thus, there is no evidence that [Appellant] was placed in special education because he was mentally retarded. [Appellant] may have been placed in special education for a number of reasons, including poor attendance or behavior problems. Similarly, [Appellant's] poor grades may reflect his poor attendance rather than any mental impairments or learning disabilities. [Appellant] failed to present any other school records, social services records, or other psychological records to prove that his mental retardation originated before age 18.

Id. at 10-11.  With respect to the testimony of Appellant's sister Alice, and Appellant's aunt, Trillis Cronin, that Appellant could not read, write, or do math when he was a child, the trial court observed that those witnesses "have no special training or skill to identify or diagnose learning disabilities or mental retardation."  Id. at 12.

On direct appeal, Appellant challenged, *inter alia*, the trial court's determination that he failed to establish all three prongs of Miller.  With regard to the age of onset of his intellectual disabilities, Appellant emphasized that "Sedlock . . . opined that the onset of appellant's supposed mental retardation occurred prior to age eighteen, based upon his school records showing he was in special education classes, the testimony of appellant's sister, and Dr. Bernstein's testimony that IQ does not change over a lifetime."  VanDivner, 962 A.2d at 1184.  We rejected Appellant's arguments, and affirmed the trial court's findings, stating:

> We see no error in the trial court's finding that [A]ppellant failed to present sufficient evidence to establish that the onset of his alleged mental retardation occurred prior to age eighteen. The court properly noted that there were no IQ tests from [A]ppellant's childhood produced; and his school records do not establish that he was placed in special education classes as a result of mental retardation. Indeed, the evidence demonstrated that such a placement could result from behavioral problems rather than from mental retardation. The trial court also recognized that [A]ppellant's excessive absences from school could very well have been the cause of his poor academic performance. Thus, [A]ppellant simply failed to establish that the onset of his alleged mental retardation occurred prior to age eighteen. And, as the trial court noted, [A]ppellant's failure to establish this necessary element requires rejection of his claim of death penalty ineligibility due to mental retardation.

Id. at 1186.

Thereafter, and the focus of the present appeal, in his amended PCRA petition, Appellant alleged that trial counsel was ineffective for, *inter alia*, "failing to discover,

develop, and present . . . conclusive evidence of mental retardation" which manifested prior to age 18. Amended PCRA Petition, 5/25/12, at 107. To support his allegations of counsel's ineffectiveness in this regard, at his PCRA hearing, Appellant presented, *inter alia*, the testimony of Dr. Alvin Sheetz, who served as Assistant Supervisor of the Fayette County Special Education Program from 1954 through 1958, and Supervisor of the Special Education Program from 1958 through 1970. In 1970, Dr. Sheetz became the Director of Special Education Intermediate Unit, serving in that capacity until his retirement in 1993. In each of his three positions, Dr. Sheetz was responsible for developing and overseeing the Special Education Program in Fayette County.

When asked to describe the process for placing a student in the Special Education Program, Dr. Sheetz explained: "First, academically [the student wasn't] doing too well. And the teacher became aware of it and reported it to the principal. The principal then reported it to me. And I examined the child. They had to have an IQ on the Stanford Benet [sic] of between 50 and 75." N.T. PCRA Hearing, 10/24/12, at 76. Dr. Sheetz testified that, pursuant to state regulations which took effect in 1945, students could not be placed in a special education class unless they were given an IQ test which resulted in a score between 50 and 75. Id. at 76.[11] Dr. Sheetz indicated that

---

[11] Appellant introduced into evidence a copy of the Pennsylvania Department of Public Instruction (renamed the Pennsylvania Department of Education in 1969) Bureau of Special Pupil Services Standards for the Organization and Administration of Special Classes (hereinafter "State Regulations") from the Pennsylvania State Archives. The State Regulations provided, with respect to special classes for elementary students, *inter alia*:

> Constitution: Classes shall include mentally retarded children with I.Q. range from approximately 50 to 75 at elementary chronological age range. Such classes shall contain only the mentally defective who are declared after proper examination to be educable in groups of the size constituting the classes.

(continued…)

no child with an IQ above 75 was ever placed in the Special Education Program in Fayette County during his tenure. Id. at 78-79. When questioned about the accuracy of Dr. Peters' testimony at Appellant's pretrial hearing that there was no formalized evaluation procedure for student placement in the Special Education Program in 1964 and 1965, when Appellant was in 10th grade, and that students might be placed in the Special Education Program due to behavior issues or attendance problems, Dr. Sheetz indicated that her testimony was "totally incorrect." Id. at 81. Based on evidence that established that Appellant was placed in the Special Education Program beginning in 1958, when he was 9 years old, see infra, Dr. Sheetz testified that Appellant's IQ "definitely" was 75 or below in 1958-1959. Id.

Appellant also presented the testimony of John Purcell, the Solicitor for the Frazier School District for the past 20 years. Mr. Purcell confirmed that, initially, the only school record for Appellant which could be located was Appellant's report card for the 1964-1965 school year, when Appellant was 15 and in the 10th grade, which indicated that he was in the Special Education Program. However, Mr. Purcell explained that, after conducting a search for records based on the family name and for a particular time period, additional records subsequently were located in a basement

---

(…continued)

> Admission only after full examination by a psychological examiner or a public school psychologist, and upon his recommendation.

State Regulations, Dep't of Public Instruction, Bureau of Special Pupil Services, November 1945. Additionally, with regard to secondary students (junior and senior high school), the State Regulations provided:

> Constitution: Children 13 or 14 chronological age and up, mental age approximately 9, I.Q. range from approximately 50 to 85. This class shall not include children who are behavior problems for reasons other than mental retardation.

Id.

storage area in the administrative offices of the high school in Perryopolis. N.T. PCRA Hearing, 1/30/13, at 61-62. Mr. Purcell indicated that it was "a little bit more difficult" to obtain the records because, during the relevant time period, certain elementary schools were closing, while others were opening. Id. at 63. Mr. Purcell further explained that, while the School District tries to retain all student records, some records had been lost in a flood, and even some of the records that were copied showed evidence of moisture or water damage. Id.

The additional records Mr. Purcell described, and which were introduced into evidence at the PCRA Hearing, included, *inter alia*, a Jefferson School District Attendance Register for the school year 1956-1957, when Appellant, age 7, was in the first grade at Madison School (PCRA Hearing Exhibit 9), and a Jefferson School District School Attendance Register for the school year 1957-1958, when Appellant, age 8, repeated the first grade, and which recommended that Appellant not be promoted to second grade, but, rather, be placed in the Special Education Program for the following school year (PCRA Hearing Exhibit 7). As discussed infra, Appellant's school records for the school years 1958-1959 through 1963-1964, when Appellant should have been in grades 4 through 9, were never introduced into evidence.

The additional records also included the permanent student records for several of Appellant's siblings. The permanent record for Appellant's brother Harry indicates that he repeated both kindergarten and the first grade;[12] in May 1959, at age 9, he took the Revised Stanford Binet test and scored a 72; and he was placed in the Special Education Program for the 1959-1960 school year, where he remained at least through 1964. Relevant to Appellant, Harry's Pupil Permanent Record listed each of his siblings

---

[12] The school records notwithstanding, when testifying at Appellant's PCRA Hearing, Harry denied having repeated any grades. N.T. PCRA Hearing, 1/30/13, at 44.

and their ages and/or grades, including Appellant, whose age was listed as 11 and was identified as being in "Special Class." Id. at 67.

Appellant also introduced into evidence the permanent record for his sister, Mildred. Mildred's permanent record indicated that, in 1957, at age 11, she scored a 63 on the Stanford Binet test, and was in the Special Education Program in the Frazier School District during 10th and 11th grade. The permanent record for Appellant's brother Joseph indicates that, in 1968, at age 10, Joseph scored a 74 on the Stanford Binet test, and was placed in the Special Education Program beginning with the 1967-1968 school year. Finally, the permanent record for Appellant's sister Ruth indicates that, in 1969, at age 10, she scored a 74 on the Stanford Binet test.

Appellant also presented the testimony of Dr. Susan Rich, an expert in the field of diagnosing, counseling, and treating Fetal Alcohol Spectrum Disorder ("FASD")[13] and Fetal Alcohol Syndrome ("FAS"). Dr. Rich testified that FAS is characterized by dysmorphic facial features, evidence of brain dysfunction, and prenatal and postnatal growth deficiency in the presence of prenatal alcohol exposure. With specific regard to the effect of FAS on brain dysfunction, Dr. Rich explained that an individual with FAS

> has a degree of cognizant deficit that doesn't have to be to the degree of mental retardation. It could be a variety of neurodevelopmental problems which include brain damage, neurologic problems, neuropsychiatric problems, learning

---

[13] FASD is an umbrella term used to refer to all prenatal alcohol-induced impairments, including FAS. Christopher Fanning, Defining Intellectual Disability: Fetal Alcohol Spectrum Disorders and Capital Punishment, 38 Rutgers Law Rec. 1 (2010-2011) (citing Timothy E. Moore & Melvyn Green, Fetal Alcohol Spectrum Disorder (FASD): A Need for Closer Examination by the Criminal Justice System, 19 Criminal Reports 99, 100 (July 2004)). Individuals with FASD may experience, inter alia, poor coordination, hyperactive behavior, attention and memory problems, difficulties in school, learning disabilities, speech and language delays, intellectual disability or low IQ, and poor reasoning and judgment skills. See http://www.cdc.gov/ncbddd/fasd/facts.html.

disabilities, attention problems, executive dysfunction, that sort of thing.

N.T. PCRA Hearing, 10/24/12, at 11-12.

Dr. Rich testified that she conducted physical, neurological, and psychiatric examinations of Appellant, and diagnosed him with partial FAS. Id. at 32-33. With regard to Appellant's facial features, Dr. Rich noted that several of Appellant's features were characteristic of FAS, including his wide set eyes, short upturned nose, thin upper lip, flattened nasal bridge, and ears which are tilted back and low set. Id. at 17-19. Dr. Rich further observed that, while many individuals experience a "lessening or a softening of the features as they get older, because the face continues to develop," Appellant "still carried nearly every one of the [facial] features" that are consistent with FAS. Id. at 16. Dr. Rich also testified that the MRI of Appellant's brain reveals significant brain damage that would only be caused by heavy prenatal exposure to alcohol: "You don't see this degree of malformation that often, because it means he had heavy alcohol exposure." Id. at 30. Dr. Rich suggested Appellant's mother "had to be a binger" who "drank say four to five drinks pretty frequently throughout the pregnancy." Id. at 31.

Finally, Dr. Rich explained that she diagnosed Appellant only with "partial" FAS, as opposed to full FAS, because she did not have sufficient information as to Appellant's growth development as a child. She stressed that the term "partial" did not describe the degree of Appellant's brain damage, and she further stated that if Appellant was .4 centimeters shorter, or if she had his childhood growth records, she could "guarantee you with [his] degree of brain damage, he is going to meet criteria for full FAS." Id. at 33.[14]

_____

[14] The PCRA court concluded, based on Dr. Rich's unrebutted testimony, that Appellant "has established that he suffers from partial fetal alcohol syndrome." PCRA Court (continued…)

In addition to the testimony of Dr. Rich, Appellant presented the testimony of Dr. Kristine Jacquin, an expert in diagnosing intellectual disabilities. Dr. Jacquin testified that she spent 84 hours evaluating Appellant, which included two full days of evaluating Appellant in person; three days conducting in-person interviews of people who knew Appellant; conducting telephone interviews of people who knew Appellant; and reviewing records. N.T. PCRA Hearing, 11/16/12, at 29-30. Dr. Jacquin indicated that, in addition to Appellant, she interviewed Appellant's siblings, Albert and Harry, and their wives; Appellant's aunts, Trillis Cronin and Cecilia Smith, and another aunt; Appellant's cousin, Raymond Smith; Appellant's ex-wife, Loura VanDivner; Appellant's daughter, Jamie; Appellant's sisters, Mildred and Alice; and Dr. Sheetz. Id. at 32.

Dr. Jacquin opined that the IQ test previously administered to Appellant by Sedlock revealed that Appellant has an IQ between 56 and 66. Id. at 58. With regard to the correlation between the results of an adult IQ test and an individual's "pre-eighteen diagnosis," Dr. Jacquin testified:

> [A]n adult IQ test actually correlates very strongly. It is thought to be the case that when you have an adult IQ test score that you can assume that that person's level of functioning on that adult IQ test is equivalent to their functioning on, what their functioning would have been in childhood with an appropriate IQ test at that time in childhood. With the exception that if there is some intervening event that would lead you to conclude based on research that something interfered with their intellectual functioning. So a really severe head injury that dramatically

(…continued)
Opinion, 1/17/14, at 46. Notwithstanding this diagnosis, the PCRA court determined that Pennsylvania law "does not recognize partial fetal alcohol syndrome as an exception to the imposition of the death penalty," and, further, that this Court "has construed Atkins and the exception to the imposition of the death penalty to include only a defendant diagnosed with mental retardation." Id. at 46 (citing VanDivner, 962 A.2d at 1189).

impacts their functioning could be something that would make you think that the adult IQ test was an overestimate or an underestimate depending on the nature of the change.

Id. at 43-44. However, Dr. Jacquin further explained:

[E]ven if you have that kind of intervening event that makes you uncertain that the adult IQ is equivalent to what child IQ would have been, there are really strong, robust measures, what we call pre-morbid intelligence, and the word pre-morbid in this context refers to pre-eighteen and pre-any injuries that might have occurred. And those indicators have been shown to be solid and robust despite head injuries, despite passage of time.

Id. at 44. Dr. Jacquin acknowledged that, in rare instances, disease or severe injury "could impact intellectual functioning," but reiterated that, generally, "IQ is stable over time." Id. at 58-59. When asked if she thought Appellant's head injuries were severe enough to have affected his IQ, however, Dr. Jacquin replied that she did not. Id. at 60.

Dr. Jacquin further explained that, upon learning from Appellant's aunts that his mother drank heavily during the time she was pregnant, she spoke with Dr. Rich. Dr. Jacquin opined that Appellant had several characteristics that are generally associated with FAS, including "executive functioning deficit, difficulties with problem solving," and his facial features, and that, as FAS occurs prenatally, the resulting impairment necessarily occurs prior to age 18. Id. at 66. Ultimately, Dr. Jacquin testified that, based on, *inter alia*, Appellant's adult IQ score, "the evidence related to being in special education and what that meant, that you had to have an IQ in the mental retardation level range," and other factors, she is "strongly convinced that [Appellant] meets the criteria for pre-eighteen onset of intellectual disability, the intellectual, significantly sub-average intellectual functioning." Id. at 74-75.

Appellant also presented the testimony of Mary Christy, who worked at the Neville Island Driver's License Exam Center in 1992, when Appellant took his

recertification test for a CDL. Christy testified that individuals could take a non-written CDL test, whereby a computer asked the test-taker questions through a telephone hook-up, and the test-taker only needed to press one button to answer true, and another to answer false. Id. at 6. This method of testing took place in a separate room from where the written test was administered. Id. Christy was shown a paper indicating that Appellant had passed the non-written version of the CDL test on February 5, 1992, and she confirmed that the signature on the paper was hers. Id. at 7-8.

Finally, Appellant's ex-wife, Judith Ann DiJoseph, testified that she was married to Appellant from 1988 to 2000, and, at one point during that time, Appellant had to take a test to obtain his CDL license. Id. at 126. DiJoseph testified that, because she was concerned Appellant would not be able to pass the test on his own, she quizzed him for approximately 2 hours a day over a period of two months. Appellant had obtained a copy of the CDL manual, and DiJoseph would read each question, and then give Appellant the answer, repeating the process until Appellant was able to answer each question. Id. at 127-28. She further testified that, once Appellant passed the test, she accompanied him on his trucking trips because he had difficulty "keeping up with the logs" that were required; she also handed him the money for the tolls and read the maps. Id. at 130.[15]

Ultimately, the PCRA court rejected Appellant's claim that trial counsel was ineffective for failing to discover, develop, and present evidence of his intellectual disabilities, and, more specifically, evidence that Appellant's intellectual disabilities

---

[15] The Commonwealth presented five witnesses at the PCRA hearings: Attorneys Zerega and Harper; Trooper James Monkelis, one of the arresting officers; Matthew Thomas, who testified that he saw the victim shortly before the shooting occurred; and Trooper Pierre Wilson, who interviewed a number of the witnesses to the shooting, including Chrissy Newman and Cheree Parill. None of these witnesses offered testimony relating to Appellant's intellectual disabilities.

existed prior to age 18. In doing so, the PCRA court first opined that "the assumptions made by Dr. Jacquin cannot be substantiated nor sustained." PCRA Court Opinion, 1/17/14, at 23. With regard to Dr. Jacquin's opinion that Appellant's head injuries did not affect his IQ, the PCRA court noted her testimony was inconsistent with the trial testimony of Dr. Bernstein, who opined that Appellant's head injuries did impact his functioning:

> Disregarding this evidence of record, Dr. Jacquin, who is a psychologist and not a medical doctor, made her own medical diagnosis and concluded that the three known head injuries suffered by [Appellant] have had no impact on [Appellant's] functioning. Such a conclusion cannot be accepted and must fail in light of the testimony of the expert medical witness called by [Appellant] at trial. It also causes this Court to question the credibility and agenda of Dr. Jacquin.

Id. at 24.

The PCRA court also criticized Dr. Jacquin's reliance on the information provided to her by Dr. Sheetz regarding the state regulations that prohibited students with IQs above 75 from being placed in the Special Education Program, stating:

> Dr. Sheetz could not testify definitively as to whether he was the only special education evaluator in 1957, acknowledging that he "was *probably* the only one doing it" but, at some point, he "had to hire other people." . . . Speaking as to the duration of a student's placement in the special education program, Dr. Sheetz agreed that once a student was identified as requiring special education, that student would remain in special education throughout his school career. With regard to the retention of records, Dr. Sheetz testified that *if* IQ testing occurred, he would have placed the results in the student's folder and that "school permanent records stay in the school." However, Dr. Sheetz offered no testimony or explanation as to why there were no records in [Appellant's] folder indicating that he had been tested.

<u>Id.</u> at 25-26 (record citations omitted) (emphasis original).[16]  The PCRA court observed that, according to Peters, "a formalized evaluation procedure [for placing students in a special education class] did not take effect until 1975" and "there was nothing in [Appellant's] folder to indicate whether any evaluation tools were used to determine why [he] was placed in special education."  <u>Id.</u> at 26.

Finally, the PCRA court noted that it found Dr. Wright's testimony at Appellant's pretrial hearing to be credible.  Specifically, the PCRA court recounted Dr. Wright's testimony that Appellant's school records contained "no reference to mental retardation prior to age 18," <u>id.</u> at 27; that Appellant was able to read, and wrote the phrase "I love you," N.T. Pretrial Hearing, 12/8/06, at 234; that Appellant had multiple risk factors for developing cognitive impairment later in life; that "because [Appellant] was in special education, you cannot assume that he was there because he was mentally retarded"; and that Appellant "has a lot of reasons to try to fool me."  PCRA Court Opinion, 1/17/14, at 28-29.  The PCRA further cited Dr. Wright's testimony that, in his opinion, Appellant "does not have a diagnosis of mental retardation," and "in order to make a diagnosis of mental retardation, there must be testing prior to the age of eighteen."  <u>Id.</u> at 29.  Reiterating that the additional school records of Appellant and his siblings which were presented at the PCRA hearings "are devoid of [Appellant] being tested," and "do not identify [Appellant] as mentally retarded," the PCRA court concluded: "the fact remains that no credible evidence exists to establish [Appellant's] intelligence quotient or mental retardation prior to the required pre-eighteen age of onset."  PCRA Court Opinion, 1/17/14, at 30-31.

---

[16] When quoting from the PCRA court's opinion, we have corrected the spelling of Dr. Sheetz's name.

In response to Appellant's argument that the PCRA court erred in determining that Appellant failed to present evidence that his intellectual disabilities existed prior to age 18, the Commonwealth asserts that the PCRA court properly rejected the testimony of Drs. Jacquin and Sheetz, instead crediting the testimony of Dr. Wright, and reiterates that Appellant failed to introduce evidence of any IQ testing prior to age 18.

As we recognized in Bracey, supra, our review of a PCRA court's determination as to whether a petitioner is intellectually disabled pursuant to Atkins and Miller involves a mixed question of law and fact:

> A question involving whether a petitioner fits the definition of [intellectual disability] is fact intensive as it will primarily be based upon the testimony of experts and involve multiple credibility determinations. Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. We choose this highly deferential standard because the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.

117 A.3d at 273. Following an extensive review of the transcripts of Appellant's pretrial hearing, trial, and PCRA hearings, and the exhibits of record, we are constrained to conclude that the PCRA court's factual finding that Appellant failed to establish that his intellectual disabilities existed prior to the age of 18 is not supported by substantial evidence.

Notably, according to Dr. Sheetz, the Supervisor of the Special Education Program in Fayette County at the time Appellant was a student, and whose testimony was unopposed at the PCRA hearing, state regulations dating back to 1945 **prohibited** any student with an IQ above 75 from being placed in the Special Education Program, absent submission of a report to Harrisburg, which never occurred in Fayette County.

N.T. PCRA Hearing, 10/24/12, at 76-79 (to be placed in the Special Education Program, a student's IQ on the Stanford Binet scale had to be between 50 and 75).[17] Although the PCRA court relied on Peters' testimony that there was no formalized evaluation procedure for placing students in the Special Education Program prior to 1975, Peters admitted that she was not employed by the school district during the relevant time period, and she was equivocal in her testimony as to how students were placed in the Special Education Program. During the Commonwealth's cross examination of Peters at Appellant's pretrial hearing, when asked to confirm that placement into special education "was informally made" during the time Appellant was in school, Peters replied: "In most cases. That was 40 years ago, and I wasn't there, but in most cases." N.T. Pretrial Hearing, 11/27/06, 61-62. Further, Dr. Sheetz expressly stated that Peters' suggestion that a student might be placed in the Special Education Program due to behavior issues or attendance problems was manifestly incorrect. N.T. PCRA Hearing, 10/24/12, at 81.[18]

---

[17] As noted above, the PCRA court criticized Dr. Jacquin's reliance on specific information provided by Dr. Sheetz, including his testimony that state regulations precluded any student with an IQ above 75 from being placed in the Special Education Program, because "Dr. Sheetz could not testify that he or anyone else tested [Appellant], or that [Appellant] had a pre-eighteen IQ of mental retardation." PCRA Court Opinion, 1/17/14, at 26. Appellant contends that the PCRA court misapplied Pa.R.E. 703 to preclude Dr. Jacquin from relying on the state regulations to conclude Appellant's intellectual disability manifested prior to age 18, Appellant's Brief at 38, and that the PCRA court erred in refusing to admit Dr. Jacquin's report into evidence, and improperly discounting Dr. Jacquin's opinion on this basis. Id. at 40. In light of our conclusion regarding the age of onset of Appellant's intellectual disability, we need not separately address this claim.

[18] Appellant attached to his PCRA petition affidavits from three individuals who attested to being in special education classes with Appellant between 1958 and 1965, all of whom stated that Appellant never caused trouble in class, but, rather, was quiet and often slept during class. Appellant's Amended PCRA Petition, Exhibits 32, 33, and 34.

The permanent records of Appellant's siblings further corroborate Dr. Sheetz's explanation of the procedure by which students were placed in the Special Education Program during the time Appellant attended school. Mildred, Harry, Joseph, and Ruth were given IQ tests when they were 9 to 11 years of age, and, after receiving test scores below 75, they were placed in the Special Education Program. The IQ test scores for Appellant's siblings were recorded on their permanent records, but were not listed on the yearly attendance registers or their report cards. Indeed, the permanent records introduced into evidence for Harry, Joseph, and Ruth contain information and grades for the school years both prior and subsequent to their respective IQ tests in the second or third grade.

As discussed above, the only records the school district produced pertaining specifically to Appellant included Appellant's report card for the 1964-1965 school year, when Appellant was in the 10th grade; the Jefferson School District Attendance Registers for the school years 1956-1957 and 1957-1958; and a permanent record for Appellant, which contained information only pertaining to the 1964-1965 school year. Although both the 1957-1958 attendance register and Appellant's 10th grade report card identify Appellant as being in the Special Education Program, they do not indicate Appellant's IQ score, a fact repeatedly emphasized by the PCRA Court. See PCRA Court Opinion, 1/17/14, at 25-26 (noting that Dr. Sheetz testified that, if he administered an IQ test to a student, the results would have been placed in the student's folder and that, generally, "school permanent records stay in the school," and observing that "Dr. Sheetz offered no testimony or explanation as to why there were no records in [Appellant's] folder indicating he had been tested"). However, Purcell, the Solicitor for the Frazier School District, explained that, although the School District tries to retain all student records, some of its records had been lost in a flood, and even some of the

records that were copied showed evidence of moisture or water damage. Id. This uncontradicted evidence may account for the absence of a complete set of records for Appellant, including a permanent record containing information for more than a single school year, and, at any rate, undermines the PCRA court's focus on Dr. Sheetz as having offered no explanation as to why there were no records indicating Appellant had been given an IQ test. In light of all of the above, we conclude there was no basis for the PCRA court to discount Dr. Sheetz' testimony that Appellant could not have been placed in the Special Education Program unless he had been given an IQ test which resulted in a score of 75 or below.

With respect to the PCRA court's determination that Dr. Jacquin's testimony regarding the effect of Appellant's head injuries on his intellectual functioning was inconsistent with the expert medical testimony of Dr. Bernstein, we note that Dr. Jacquin initially testified that Appellant's medical records indicated that he suffered "no lasting effect from the head injuries" and that, based on those records, she "[felt] safe in concluding that those head injuries hadn't impacted his functioning." N.T. PCRA Hearing, 11/16/12, at 59. However, Dr. Jacquin conducted her own evaluation of Appellant, administering three additional tests directed at measuring pre-morbid functions, the results of which suggested Appellant's head injuries had not affected his IQ. Id. at 59, 60.

Dr. Bernstein testified at trial that Appellant's head injuries may have resulted in mild dementia, and affected his ability to control his impulses, but, like Dr. Jacquin, distinguished Appellant's dementia from his IQ: "I believe that [Appellant] meets objective criteria for mild mental retardation per his neuropsychological testing. **He also has** what I would term a mild dimensia [sic] due to both head trauma and

cerebrovascular disease." N.T Trial, 2/12/07, at 124 (emphasis added). Dr. Bernstein further explained:

> IQ is predicated on long term memory. If you take an IQ test, a lot of it is about stuff you learned in grade school, high school, etc., and you have to be able to recall it and spit it out. So IQ tends to be preserved early on in dimensia [sic].

Id. at 129. Thus, Dr. Jacquin's testimony that Appellant's head injuries did not affect his IQ was **consistent** with the expert medical testimony of Dr. Bernstein.[19]

For all of the above reasons, we are constrained to hold that the PCRA court's factual finding that Appellant failed to establish that his intellectual disabilities manifested prior to age 18 is not supported by substantial evidence. Consequently, we find that Appellant's claim that trial counsel was ineffective for failing to present this evidence at his pretrial hearing has arguable merit.

However, as noted supra, in order to prevail on a claim of ineffectiveness under the PCRA, a petitioner must also establish that no reasonable basis existed for counsel's action or failure to act, and that the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. Pierce, 786 A.2d at 213. The PCRA court, having concluded Appellant's claim did not have arguable merit, did not address these two additional prongs of the ineffectiveness analysis.

Accordingly, we vacate the PCRA court's order and remand this matter to the PCRA court for preparation of a supplemental opinion addressing whether any

---

[19] Moreover, by the time Dr. Bernstein testified at Appellant's trial, the trial court had rejected Appellant's pretrial petition to bar the death penalty under Atkins and Miller. Thus, Appellant's best option for avoiding a capital sentence was to present Dr. Bernstein's testimony opining that Appellant's head injuries impacted his ability to control his impulses.

reasonable basis existed for trial counsel's failure to investigate the state regulations pertaining to special-education placement which existed when Appellant was a student; failure to seek additional school records for Appellant and his siblings after initially receiving only Appellant's attendance record for the 1964-1965 school year; and failure to present the testimony of Dr. Sheetz, the individual responsible for special education placement at the time Appellant was a student.

Additionally, because a petitioner seeking relief under the PCRA must demonstrate prejudice by showing there is a reasonable probability that the result of the proceeding would have been different, the PCRA court must also consider whether, by demonstrating that his intellectual disabilities existed prior to age 18, Appellant's petition to preclude imposition of the death penalty pursuant to Atkins and Miller would have been granted. In making this determination, the PCRA court must address the first and second prongs of Miller, and, specifically, should consider and address Appellant's claim that trial counsel was ineffective for failing to introduce evidence that an intellectually disabled individual could pass the non-written CDL test after extended study, as this claim is relevant to the second prong of Miller — limitations in adaptive behavior.

Order vacated and case remanded. Jurisdiction retained.

Mr. Justice Eakin did not participate in the decision of this case.

Mr. Chief Justice Saylor and Messrs. Justice Baer and Stevens join the opinion.

Mr. Chief Justice Saylor files a concurring opinion.